† Certified Civil Trial Attorney
‡ Diplomate NJ Municipal Law
\* NJ & NY Bars

**935 RIVER DRIVE**
*WAWEL SAVINGS BANK BLDG.*
**GARFIELD, NEW JERSEY 07026**

(201) 438-7770
FAX: (201) 438-5726

\*REPLY GARFIELD ONLY

E-mail: office@damlaw.com

Dennis A. Maycher\* † ‡
═══ ♦ ═══
Thomas P. Monahan, Jr. †

___☉___
Of Counsel
Ralph A. Leder (1936-1992)

**May 28, 2008**

<u>**Via OVERNIGHT MAIL**</u>
Honorable Mary L. Cooper, U.S.D.J.
Attn: Elizabeth Heffner, Courtroom Deputy
United States District Court, Room 5000
Clarkson S. Fisher Federal Bldg. & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

> Re: In Re Jersey Tractor Trailer Training, Inc., Debtor; Wawel
> Savings Bank v. Yale Factors NJ LLC, et al. on appeal from
> the United States Bankruptcy Court

Dear Ms. Heffner:

Enclosed herewith please find an original and three copies of the Brief of Respondent, Wawel Savings Bank, SLA, in opposition to the appeal of Appellant, Yale Factors NJ LLC, in the above referenced matter. This brief was delayed due to the theft of a laptop computer last Thursday night from my vehicle (which has been reported to the police in Clark, New Jersey), which held an extensively revised version of this brief in its local disc. Revisions lost due to the theft were required to be reincorporated into the brief. This matter has been discussed with my adversary Corey Grey, Esq., who consented to a brief extension so long as he receives a reciprocal two days. I attempted to contact Ms. Heffner on the issue, however, she will be out of her office until June 2, 2008.

Please advise as to whether this request is acceptable to the Court.

New York Office
204 West 84ᵗʰ Street
New York, New York 10024
(212) 580-6500

South Jersey Office
7409 Long Beach Blvd.
Brant Beach, New Jersey 08008
(609) 494-0070

Thanking you for your attention and courtesies in this matter, I remain

Very truly yours,

THOMAS P. MONAHAN, JR.

TPM/jlb
cc:    Cory Mitchell Gray, Esq.    *(Via Overnight Maill)*

**LAW OFFICES DENNIS A. MAYCHER, P.C.**
2 Mount Pleasant Avenue
P.O. Box 3308
Wallington, NJ 07057
(201) 438-7770
Attorneys for Respondent
Wawel Savings Bank
**Thomas P. Monahan, Jr. 3453**

| | |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT |
| | : FOR THE DISTRICT OF NEW JERSEY |
| JERSEY TRACTOR TRAILER | : **(ON APPEAL FROM THE UNITED STATES** |
| **TRAINING, INC.** | **BANKRUPTCY COURT)** |
| | : Chapter 11 |
| | : |
| Debtor.: | Case No.: 06-12743 MBK |
| : | |
| | : Honorable Michael B. Kaplan |
| WAWEL SAVINGS BANK, | : |
| | Adv. Pro. No. 06-02003/MBK |
| Plaintiff | : |
| v. | : |
| JERSEY TRACTOR TRAILER | : |
| TRAINING, INC. and YALE | |
| FACTORS NJ LLC, | : |
| Defendants. | : |

---

## BRIEF OF RESPONDENT WAWEL SAVINGS BANK, SLA

---

**OF COUNSEL:**
**DENNIS A. MAYCHER, ESQ.**
**THOMAS P. MONAHAN, JR., ESQ.**

## PRELIMINARY STATEMENT

Appellant has filed an appeal from the U.S. Bankruptcy Court's well articulated and well reasoned October 21, 2007 Judgment (hereinafter the "Judgment") pursuant to which the Trial Court entered Judgment in an adversary proceeding in favor of Wawel Savings Bank (hereinafter "Wawel") and against Yale Factor NJ, LLC (hereinafter "Yale"). The Trial Court in its September 27, 2007 Opinion and Order (hereinafter the "Opinion"), held that Wawel had a first lien position, superior to Yale in the Accounts Receivable of the Debtor Jersey Tractor Trailer Training, Inc. (hereinafter "JTTT") that continues to be enforceable after the sale of those Accounts Receivable from JTTT to Yale. The Court dismissed Yale's defenses that (a) it was the owner of Accounts Receivable it had purchased from JTTT or (b) in the alternative, that it was a purchaser in good faith or holder in due course and therefore took those Accounts Receivable free and clear of Wawel's security interests.

Judgment should be affirmed as the Trial Court recognized that Yale was not a holder in due course of the Accounts Receivable, as it had incorrectly and simply failed to conduct appropriate due diligence with regard to entering into the factoring relationship with JTTT. Yale acted at its own risk in entering into this relationship without conducting an appropriate UCC-1 search upon the assets and accounts receivable of JTTT. The Court appropriately and properly applied the relevant law under existing Uniform Commercial Code Analysis.

In its brief, Yale argues that it was not errors in the Findings of Fact derived from the testimony of the witnesses and the admission of documents, but rather that the Court erred in its application of the law to these Findings of Fact. It is clear that Yale is attempting to take a "second bite at the apple" in an attempt to overturn this well thought out and well reasoned Opinion supported by all appropriate law. Despite arguing that they do not intend to challenge

the findings of fact, throughout Appellant's appeal they attempt to apply a "new spin" on the evidence submitted at the time of trial in a futile attempt to overturn the Trial Court's Opinion.

## **FACTS STIPULATED BETWEEN THE PARTIES**

1)  Plaintiff, Wawel Savings Bank, SLA (hereinafter "Wawel"), is a federally chartered banking institution organized and existing under the laws of the United States of America.

2)  Debtor, Jersey Tractor Trailer Training, Inc. ("hereinafter JTTT"), is a corporation organized and existing under the laws of the State of New Jersey with its principle place of business located at 201 State Highway 17; Rutherford, New Jersey 07070.

3)  Defendant, Yale Factors NJ, LLC. ("hereinafter Yale"), is a limited liability company organized and existing pursuant to the law of the State of New Jersey with its principle place of business located at 39 West $37^{\text{h}}$ Street; New York, New York 10018.

4)  On March 7, 2002, Wawel entered into a loan agreement with JTTT and its President, William B. Oliver, for the principal amount of $315,000 (Plaintiffs Exhibits "P-7" and "P-8").

5)  The loan between Wawel and JTTT was to be repaid in seven (7) years at an annual interest rate of 12% amortized over twenty (20) years (See Plaintiffs Exhibit "P-7").

6)  On January 18, 2002, JTTT submitted a commercial loan\line application in order to obtain the loan and the amount of $315,000. (See Plaintiffs Exhibit "P2").

7)  On January 22, 2002, a Commercial Loan Offering was prepared by Wawel and forwarded to JTTT. (See Plaintiffs Exhibit "P-3").

8)  The January 22, 2002, Commercial Loan Offering listed under the term "collateral," "UCC-1 filing on all Capital Equipment and all other assets of the company..." (See

2

Plaintiff's Exhibit "P-3").

9) On January 23, 2002, Robert Ranzinger forwarded a letter to William Oliver, President of JTTT which provided a detailed loan commitment. Once again this document provided under the term "collateral" the following language, "UCC-1 (1st position) filing on all capital equipment and all other assets of the company." (See Plaintiff's Exhibit "P-4").

10) In furtherance of obtaining this loan, Debtor entered into a Security Agreement with Wawel providing that all inventory, equipment, accounts, instruments, documents, chattel paper and other rights to payment, general intangibles, government payments and programs would serve as collateral.

11) To perfect Wawel's Security Agreement, Uniform Commercial Code Financing Statements ("UCC-1") were executed and filed with the New Jersey Department of Treasury on May 24, 2002 and the Bergen County Clerks Office on June 12, 2002 (See Plaintiffs Exhibits "P-9"and "P-10").

12) Both the Loan Agreement and the Security Agreement define a default as "any other creditor... [Attempting] to collect any debt... [owed] him through court proceeding" (See Plaintiffs Exhibits "P-7" and "P-8").

13) On or about March 20, 2003, JTTT entered into a Factoring and Security Agreement with Yale (hereinafter the "Factoring and Security Agreement) (See Plaintiff's Exhibit "P-13").

14) The application for the factoring relationship, filled out by JTTT did not require JTTT to disclose the recurring debt of JTTT including bank loans, lines of credit etc.

15) The Dun and Bradstreet report run by Yale was run on Jersey Tractor Trailer Training; not on Jersey Tractor Trailer Training, Inc.

16) The Factoring and Security Agreement executed by JTTT was prepared by Yale.

17) The Factoring and Security Agreement referred to the entity known as Jersey Tractor Trailer Training, Inc (Plaintiff's Exhibit "P-13").

18) The name Jersey Tractor Trailer Training, Inc. was known to Harry Perkal of Yale as he prepared all documents in their name (Plaintiff's Exhibit "P-13").

19) Yale has acknowledged that if it had been aware of the UCC filing by Wawel, it would have sought to enter into a subordination agreement or have paid off Wawel's loan to JTTT.

20) A closing was conducted with regard to the factoring Agreement on March 3, 2003 (Plaintiff's Exhibit "P-13").

21) Yale filed a UCC-1 Financing Statement on March 26, 2003, on all present and after acquired accounts receivable of JTTT.

22) Wawel holds a lien prior in time to Yale's UCC-1 Financing Statement.

23) On or about December 9, 2005, Wawel's President, Robert Ranzinger, Sr., met with William Oliver to discuss the status of Debtor's checking account, which had an alarmingly low to negative balance.

24) On or about December 20, 2005, there was a meeting of all involved parties. Here, Wawel learned of approximate amounts purported to be owed by Debtor to Yale, as well as the fees and interest rate being charged by Yale.

25) At the meeting, Robert Ranzinger reminded Yale that Wawel had a valid first lien in the accounts receivable of Debtor.

26) On January 20, 2006, Debtor sent a letter to Yale informing them that it would not renew its contract which was scheduled to automatically renew on March 20, 2006.

27) Yale persisted in its collection actions against Debtor's customers culminating in Yale

obtaining an Ex Parte Order to Show Cause with Temporary Restraints against Debtor on March 8, 2006.

28) Yale did not notify Wawel of the Order to Show Cause and its attendant restraints until March 10, 2006.

29) Yale's restraints in the aforementioned Order to Show Cause included relief such as a prejudgment transfer of monies to Yale on certain accounts receivable.

30) In response to Yale's Order to Show Cause, Plaintiff intervened in the action and it is believed that certain accounts receivable payments received by Yale are being held in the attorney trust account of its attorneys.

## STIPULATED CONCLUSIONS OF LAW

JTTT'S DEFAULT

31) Debtor and Wawel entered into a duly executed Loan Agreement and Security Agreement which was in effect at all relevant times herein.

32) A material provision in these agreements was that no other creditor bring legal action against JTTT.

33) When Yale brought their initial action against JTTT in an attempt to collect an alleged debt, JTTT effectively has defaulted pursuant to its Loan and Security Agreements with Wawel.

34) As a consequence, Wawel has elected to accelerate and demand payment in full of the entire principal of the loan, plus interest, pre-payment penalties and costs of collection, including attorney fees.

# TRIAL TESTIMONY

## TESTIMONY OF WAWEL PRESIDENT ROBERT RANZINGER, SR.

1)   Plaintiff, Wawel is a federally chartered banking institution organized and existing under the laws of the United States of America

2)   Debtor JTTT is a corporation organized and existing under the laws of the State of New Jersey with its principle place of business located at 201 State Highway 17; Rutherford, New Jersey 07070. It is in the business of training its clients in the operation of tractor trailers to become qualified to pass the appropriate New Jersey D.M.V. test required to obtain a license to drive a tractor trailer. Yale Factors NJ, LLC. ("hereinafter Yale"), is a limited liability company organized and existing pursuant to the law of the State of New Jersey with its principle place of business located at 39 West 37th Street; New York, New York 10018.

3)   On March 7, 2002, Wawel entered into a loan agreement with JTTT and its President, William B. Oliver, for the principal amount of $315,000. The loan between Wawel and JTTT was to be repaid in seven (7) years at an annual interest rate of 12% amortized over twenty (20) years.

4)   In conjunction with the loan between JTTT and Wawel, Wawel conducted an appropriate and extensive due diligence search in order to determine the viability and amount of a line of credit it would provide to JTTT.

5)   On December 27, 2001 a letter was forwarded by Robert Ranzinger, managing director and CEO of Wawel to James Vincent Mariano, which was copied to William Oliver, which states:

> ...We can inform you that the undersigned is presently very close to taking the Jersey credit application to our loan committee with a

6

recommendation for approval. Obviously, as an astute businessman, you can appreciate that the due diligence process takes some time and effort and we are still pending receipt of several open items i.e.: a UCC search on corporate assets, etc..."

(See Plaintiff's Exhibit "P-1")

6)      On January 18, 2002, JTTT submitted a commercial loan\line application in order to obtain the loan and the amount of $315,000 (See Plaintiff's Exhibit "P-2").

7)      On January 22, 2002, a Commercial Loan Offering was prepared by Wawel and forwarded to JTTT. (See Plaintiff's Exhibit "P-3"). The January 22, 2002, Commercial Loan Offering listed under the term "collateral," "UCC-1 filing on all Capital Equipment and all other assets of the company..." (See Plaintiff's Exhibit "P-3").

8)      On January 23, 2002, Robert Ranzinger forwarded a letter to William Oliver, President of JTTT which provided a detailed loan commitment. Once again, this document provided under the term "collateral" the following language, "UCC-1 (1st position) filing on all capital equipment and all other assets of the company" (See Plaintiff's Exhibit "P-4").

9)      Under cover dated February 12, 2002, Philip C. Apovian, Esq., counsel to JTTT, provided to Robert Ranzinger, various documents with regard to the loan including prepared UCC-1 forms. (See Plaintiff's Exhibit "P-5").

10)     On February 14, 2002 Robert Ranzinger forwarded a letter to Philip Apovian is a providing amendment to the documents including comments with regard to the UCC-1 forms. (See Plaintiff's Exhibit "P-6").

11)     In furtherance of obtaining this loan, Debtor entered into a Security Agreement with Wawel providing that all inventory, equipment, accounts, instruments, documents, chattel paper and other rights to payment, general intangibles, government payments and programs would serve as collateral. (See Plaintiff's Exhibit "P-8").

7

12) To perfect Wawel's Security Agreement, Uniform Commercial Code Financing Statements ("UCC-1") were executed and filed with the New Jersey Department of Treasury on May 24, 2002 and the Bergen County Clerks Office on June 12, 2002 (See Plaintiffs Exhibits "P-9"and "P-10").

13) Both the Loan Agreement and the Security Agreement define a default as "any other creditor... [Attempting] to collect any debt... [Owed] him through court proceeding" (See Plaintiffs Exhibits "P-9" and "P-10").

14) Wawel holds a prior lien toYale's UCC-1 Financing Statement. Wawel's lien was perfected prior to Yale's UCC-1 Financing Statement.

15) Wawel was unaware of the factoring agreement between JTTT and Yale until December of 2005, as William is a Sophist and tomorrow Oliver never disclosed same to Wawel.

16) On December 9, 2005, Wawel's President, Robert Ranzinger, Sr., met with William Oliver to discuss the status of Debtor's checking account, which had an alarmingly low to negative balance.

17) At this meeting Mr. Oliver informed Mr. Ranzinger that he had been utilizing Yale and had run into financial problems with them, resulting in lower than usual amounts being provided to Debtor from Yale.

18) Mr. Ranzinger informed Mr. Oliver that utilization of a factor and assignment of accounts receivable in December 2005, to a third party, were contrary to Debtor's loan agreement with Wawel.

19) On December 20, 2005, there was a meeting of all involved parties including Robert Ranzinger, William Oliver, Harry Perkal, and Victor Dinofrio, CPA, Accountant for JTTT . This meeting occurred at the offices of Wawel, located in Wallington, New

Jersey. Here, Wawel learned of approximate amounts purported to be owed by Debtor to Yale, as well as the fees and interest rate being charged by Yale.

20) At the meeting, Robert Ranzinger reminded Mr. Perkal, Yale that Wawel had a valid first lien in the accounts receivable of Debtor.

21) Due to a disagreement between Wawel and Yale as to their liens, the agreement ended abruptly.

22) Mr. Ranzinger affirmed upon direct examination that at no time was there a potential loan to JTTT from Wawel in order to prove the large amount owed to Yale by JTTT at the December 20, 2005 meeting.

23) On December 23, 2005, Mr. Ranzinger met with Mr. Oliver and reaffirmed to him that the utilization of a factor was in violation of Debtor's loan agreement with Wawel and that Debtor must cease its improper relationship with Yale.

24) On January 20, 2006, Debtor sent a letter to Yale informing them that JTTT would not renew its contract which was scheduled to automatically renew on March 20, 2006.

25) Yale persisted in its collection actions against Debtor culminating in Yale obtaining an Ex Parte Order to Show Cause with Temporary Restraints against Debtor on March 8, 2006.

26) Despite having actual knowledge of Wawel's senior lien, Yale failed to notify Wawel of the Order to Show Cause and its attendant restraints until March 10, 2006.

27) Yale's restraints in the aforementioned Order to Show Cause included relief such as a prejudgment transfer of monies to Yale on certain accounts receivable in derogation of Wawel's UCC lien.

28) In response to Yale's Order to Show Cause, Plaintiff intervened in the action and it is

believed that certain accounts receivable payments received by Yale are being held in the attorney trust account of its attorney, Corey Mitchell Gray, Esq.

29) Mr. Ranzinger testified that Wawel is one of the Federal Home Loan Bank of New York's customers through a wire transfer agreement.

30) Mr. Ranzinger testified that Wawel maintains an account the Federal Home Loan Bank for the purpose of allowing its customers to conduct wire transfers.

31) Mr. Ranzinger testified that although wire transfer notices are received by the bank, they are handled by low level clerical people, and are credited to the customers' accounts.

32) In his capacity as bank president, Mr. Ranzinger indicated that he would not receive these wire transfer notices. Further, any such notices would be received to confirm that funds had been wired and credited to the collect account.

33) As a result of this documentation, he was unaware that JTTT had entered into a factoring agreement with Yale.

34) Mr. Ranzinger testified that he did not record receiving a call from Mr. Perkal at any time prior to his meeting on December 20, 2005.

35) Mr. Ranzinger recalled receiving a call from Mr. Perkal after the December 20, 2005 meeting at which time he was advised by Mr. Pellust that he acknowledged that Yale's WCC search had been performed on the incorrect corporation name and that Wawel had a first priority lien on the accounts receivable of JTTT.

## TESTIMONY OF WILLIAM OLIVER, PRESIDENT OF JTTT

1) Debtor, JTTT, is a corporation organized and existing under the laws of the State of New Jersey with its principle place of business located at 201 State Highway 17; Rutherford, New Jersey 07070. JTTT is in the business of providing training to tractor trailer drivers.

2) As JTTT did not want to disclose its factoring relationship with Yale as William Oliver believed that this could be a violation of JTTT's loan agreement with Wawel, no disclosure occurred with regard to this factoring relationship to Wawel.

3) In addition, JTTT never advised Yale, prior to closing the factoring Agreement with Yale, that it had entered into an agreement with Wawel in which a UCC-1 had been filed.

4) At the time of the initial meeting between Yale and JTTT, the only bank used by JTTT was Wawel. The initial meeting was attended by William Oliver, Harry Perkal on behalf of Yale, and Victor Dinofrio, CPA, accountant for JTTT.

5) JTTT utilized the services of a factor as JTTT was experiencing severe cash flow problems at the time of the initial meeting with Harry Perkal of Yale.

6) Yale did not review the books and records of JTTT prior to entering into the factoring agreement.

7) Yale did not meet with Victor Dinofrio, CPA, accountant for JTTT with the purpose of reviewing the accounts and records of JTTT prior to entering into the factoring agreement with JTTT.

8) Yale had met with Victor Dinofrio, CPA at the time of its initial meeting with JTTT and was aware that he was the accountant for JTTT. Yale did not solicit from Victor Dinofrio, CPA, any information with regard to the debt of JTTT prior to entering into the factoring agreement with JTTT.

9) Yale did not solicit from William Oliver, President of JTTT, any information with regard to the debt of JTTT prior to entering to the factoring agreement with JTTT.

10) Yale did not request the books and records of JTTT prior to entering into the factoring agreement with JTTT.

11) The application for the factoring a relationship, filled out by JTTT (before being provided by Yale) did not require JTTT to disclose the recurring debt of JTTT including bank loans, lines of credit etc. The loan application requested no information regarding the financial position of JTTT at the time the factoring agreement was entered into between JTTT and Yale.

12) The factoring agreement executed by JTTT was prepared by Yale.

13) The factoring agreement and all documents relating thereto referred to the entity known as Jersey Tractor Trailer Training, Inc.

14) The name Jersey Tractor Trailer Training, Inc. was known to Harry Perkal of Yale as he prepared all documents in the name of Jersey Tractor Trailer Training, Inc.

15) A closing was conducted in Hackensack, New Jersey with regard to the factoring agreement on March 3, 2003.

16) JTTT was not represented by an attorney at this closing.

17) William Oliver has testified at trial that he advised Harry Perkal of Yale, at the closing on March 3, 2003, that "Wawel had all the assets of JTTT, including accounts receivable, under its control based upon a earlier UCC filing and loan."

18) William Oliver has testified at trial that he was advised by Harry Perkal "not to worry about Wawel", at the closing of the factoring agreement with JTTT, upon being advised of the existence of Wawel and its prior liens.

19) Yale proceeded with the closing of the factoring agreement with JTTT despite knowledge of the existence of Wawel's prior liens.

20) Yale proceeded with the closing of the factoring agreement without soliciting any information as to the financial position of JTTT, which was experiencing severe cash

flow problems.

21) Wawel was unaware of the factoring agreement between JTTT and Yale until December of 2005, as William Oliver never disclosed same to Wawel.

22) On December 9, 2005, Wawel's President, Robert Ranzinger, Sr., met with William Oliver to discuss the status of Debtor's checking account, which had an alarmingly low to negative balance.

23) At this meeting Mr. Oliver informed Mr. Ranzinger that he had been utilizing Yale and had run into financial problems with them, resulting in lower than usual amounts being provided to the Debtor from Yale.

24) Debtor was transferring certain accounts to Yale despite the fact that Wawel had a priority lien.

25) Mr. Ranzinger informed Mr. Oliver that utilization of a factor and assignment of accounts receivable to a third party were contrary to Debtor's loan agreement with Wawel.

26) In December of 2005, William Oliver, for the first time, facsimiled a copy of the Yale factoring agreement to Robert Ranzinger.

27) On December 20, 2005, there was a meeting attended by William Oliver, Victor Dinofrio, CPA, Robert Ranzinger, and Harry Perkal. Here, Wawel learned of approximate amounts purported to be owed by Debtor to Yale, as well as the fees and interest rate being charged by Yale.

28) At the meeting, Robert Ranzinger reminded Yale that Wawel had a valid first lien in the accounts receivable of Debtor.

29) At not time during the meeting on December 20, 2005 was there a discussion as to whether Wawel would provide a loan to satisfy JTTT's obligation to Yale.

30) On December 23, 2005, Mr. Ranzinger met with Mr. Oliver and reiterated that the utilization of a factor was in violation of Debtor's loan agreement with Wawel and that Debtor must cease its improper relationship with Yale.

31) On January 20, 2006, Debtor sent a letter to Yale informing them that it would not renew its contract which was scheduled to automatically renew on March 20, 2006.

32) After Yale proceeded to seize the mail of JTTT, and filed an Order to Show Cause to seize the accounts receivable of JTTT, JTTT had no choice, due to cash flow issues but to declare bankruptcy.

33) Pursuant to the terms of JTTT's agreement with Yale, upon the expiration of 90 days from the purchase of an accounts receivable, if the accounts receivable remained uncollected, JTTT was required to repurchase the accounts receivable from Yale at substitution cost to JTTT.

34) From December 2005, nearly all of the accounts receivable forwarded by Yale were required to be repurchased by JTTT pursuant to the factoring agreement.

35) At the time of execution of the factoring agreement with Yale, JTTT also executed an anti fraud agreement with Yale, which enables Yale to proceed against William Oliver in the event that he violated the provisions of the anti fraud agreement.

## TESTIMONY OF HARRY PERKAL

1) On or about March 20, 2003, JTTT entered into a Factoring and Security Agreement with Yale and its President, Harry Perkal.

2) Yale has acknowledged that it conducted little or no due diligence with regard to entering into its factoring agreement with JTTT.

3) Yale acknowledges that it requires, at a minimum, the last three bank statements of the

14

potential factoring candidate to determine recurring receipts and recovering debts of the factoring candidate.

4) Yale did not receive these last three bank statements from JTTT prior to entering into the factoring agreement with JTTT.

5) At the time of the initial meeting between Yale and JTTT, in the event that Yale had reviewed JTTT's bank statements, in accordance with their own policies, the recurring payments to Wawel, would have been known to Yale.

6) Yale violated its own policies in entering into the factoring agreement with JTTT without reviewing the three months bank statements.

7) Yale did not review the books and records of JTTT prior to entering into the factoring agreement.

8) Yale did not meet with Victor Dinofrio, CPA, accountant for JTTT with the purpose of reviewing the accounts and records of JTTT prior to entering into the factoring agreement with JTTT.

9) Yale had met with Victor Dinofrio, CPA at the time of its initial meeting with JTTT and was aware that he was the accountant for JTTT. The application for the factoring agreement prepared by JTTT listed Victor Dinofrio, CPA as the accountant and financial advisor for JTTT. The application listed Wawel as JTTT's bank.

10) Yale did not solicit from Victor Dinofrio, CPA, any information with regard to the debt of JTTT prior to entering into the factoring agreement with JTTT.

11) Yale did not solicit from William Oliver, president of JTTT, any information with regard to the debt of JTTT prior to entering to the factoring agreement with JTTT. Yale did not obtain information as to the financial position of JTTT prior to entering into the factoring

agreement.

12) Yale did not request the books and records of JTTT prior to entering into the factoring agreement with JTTT. The application for the factoring a relationship, filled out by JTTT (before being provided by Yale) did not require JTTT to disclose the recurring debt of JTTT including bank loans, lines of credit, etc.

13) The only due diligence that was conducted by Yale was to allegedly run a UCC search through Dunn & Bradstreet upon JTTT not to review the two bank accounts which would have disclosed Wawel's loan.

14) The Dunn & Bradstreet report run by Yale with regard to Jersey Tractor Trailer, and was not run with regard to the entity known as Jersey Tractor Trailer Training, Inc.

15) At trial, Yale was unable to produce the Dunn & Bradstreet search allegedly run by Yale prior to entering into the factoring agreement with JTTT.

16) Despite the fact that this document was not produced, Yale argued that it completed appropriate due diligence.

17) The factoring agreement executed by JTTT was prepared by Yale.

18) The factoring agreement and all documents relating thereto referred to the entity known as Jersey Tractor Trailer Training, Inc.

19) The name Jersey Tractor Trailer Training, Inc. was known to Harry Perkal of Yale as he prepared all documents in their name.

20) If a Dunn & Bradstreet report had been run with regard to Jersey Tractor Trailer Training, Inc., the search would have disclosed the UCC-1's filed by Wawel.

21) Yale has acknowledged that if it had been aware of the UCC filing by Wawel, it would have had to enter into a priority agreement or have paid off Wawel's loan to JTTT in

order to obtain a first lien position.

22) A closing was conducted with regard to the factoring Agreement on March 3, 2003.

23) JTTT was not represented by an attorney at this closing.

24) Yale filed a UCC-1 Financing Statement on March 26, 2003, on all present and after acquired accounts receivable of JTTT.

25) Yale acknowledges that it now uses I-Lien and Dunn & Bradstreet to conduct such UCC searches due to Dunn & Bradstreet's failure to recognize Wawel's prior lien.

26) On December 20, 2005, there was a meeting of all involved parties.

## TESTIMONY OF AIDA POLANCO

1) Ms. Polano is employed by the Federal Home Loan Bank of New York (hereinafter "FHLB"). She has been the Assistant Vice President - Funds Transfers since 1993 and the Vice President - Funds Transfers since January 2005.

2) She testified that one of FHLB's member banks is Wawel and that Wawel does wire transfers through FHLB, she also testified that each member bank that signs a wire transfer agreement with FHLB maintains an account into which wire transfers can be made and in which such wire transfers are credited to the member bank's account. She also testified that additional documentation was forwarded to Wawel advising of the existence of a transfer to be credited to a customer of the member bank.

3) Ms. Polanco testified that she had no knowledge of how this documentation was handled by the member bank once received or who in fact received that documentation. She could not acknowledge whether or not Mr. Ranzinger received the documentation forwarded by FHLB to Wawel or what was done with that documentation.

4) Ms. Polanco stated that she had never spoken directly to Mr. Ranzinger or that anyone

from FHLB had spoken to Mr. Ranzinger .

5) Despite Yale's attempt to establish through her testimony that Wawel was aware of the existence of a factoring agreement between Yale and JTTT, she could provide no information on this issue. She had never received the factoring agreement nor had she forwarded it to Wawel.

6) She acknowledged that any and all documentation forwarded to Wawel simply listed the customer to which it was credited the amount, and the name of the source of the funds.

## DE BENE ESSE TESTIMONY OF PETER DINOFRIO

1) Mr. Dinofrio acknowledged that at all relevant times he was the sole accountant for JTTT. He acknowledged that he was a CPA and held all records for the company at his office. He acknowledged that he was fully familiar with the books and records of JTTT at all relevant times.

2) He testified that at the time of the initial meeting between Yale and JTTT that Wawel was the only bank used by JTTT.

3) He testified that, Yale did not review the books and records of JTTT prior to entering into the factoring agreement.

4) He testified that Yale did not meet with him for the purpose of reviewing the accounts and records of JTTT prior to entering into the factoring agreement with JTTT.

5) He stated that he had attended the initial meeting with Mr. Perkal of Yale and JTTT and that Yale was aware that he was the accountant for JTTT. Yale did not solicit from him any information with regard to the debt of JTTT prior to entering into the factoring agreement with JTTT.

6) He testified that Yale did not solicit from William Oliver, president of JTTT, any

18

information with regard to the debt of JTTT prior to entering to the factoring agreement with JTTT.

7) He testified that Yale did not request the books and records of JTTT prior to entering into the factoring agreement with JTTT.

8) He testified that on or about December 20, 2005, there was a meeting of all involved parties, including Robert Ranziger, Sr., William Oliver, Harry Perkal and himself at the offices of Wawel.

9) He testified contrary to the testimony of Mr. Perkal that there was no discussion of a potential loan by Wawel to buy out the massive obligation owed by JTTT to Yale at the time.

10) He testified that at the time of the meeting JTTT was experiencing extreme cash flow problems and had not been able to pay Wawel's loan. Therefore, Mr. Perkal's statement made upon cross-examination that at the meeting Wawel was considering a loan to pay off JTTT's obligation to Yale was devoid of logic.

11) He testified that his recollection of the December 20, 2005 meeting was that Wawel learned of approximate amounts purported to be owed by Debtor to Yale, as well as the fees and interest rate being charged by Yale.

12) Contrary to the testimony of Mr. Perkal, Mr. Dinofrio testified that at the meeting, Robert Ranzinger reminded Yale that Wawel had a valid first lien in the accounts receivable of Debtor. He further testified that the parties became irate over the issue of Wawel's priority, and that the meeting ended in a abrupt and disagreeable fashion.

13) Mr. Dinofrio testified that Mr. Perkal's recollection of the December 20, 2005, was inaccurate.

## LEGAL ARGUMENT

## I. YALE HAS FAILED TO MEET THE APPROPRIATE STANDARD REQUIRING A REVERSAL IN THIS MATTER

This appeal presents a mixed question of fact and law that must be divided into the respective components and the appropriate test applied. A Bankruptcy Court's conclusions of law, including questions of statutory construction, are subject to *de novo* review. See In re G-I Holdings. Inc., 318 B.R. 66 (D.N.J. 2004), judgment affd, 122 Fed. Appx. 554 (3[d] Cir. 2004); In re Tower Air, Inc., 397 F.3d 191, 44 Bankr. Ct. Dec. (CPR 68, Bankr. L. Rep. (CCH) P [802]39 (3[d] Cir. 2005) (reviewing statutory interpretation *de novo*).

However, the Bankruptcy Court's findings of fact cannot be set aside unless clearly erroneous. Neither the District Court nor the appellate panel is permitted to make independent factual findings, as due regard must be given to the bankruptcy judge's opportunity to assess the credibility of the witnesses. The District Court may set aside the Bankruptcy Court's findings of fact only if such findings are clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to Judge the credibility of the [evidence]. U.S. v. U.S. Gypsum Co., ii U.S. 365, 394 (1Q48). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. at .loci; Haines v. Liggett Group Inc., Q7S F.2d Si. 92 (3d Cir. 1992). This standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer City, N.C., 470 U.S. s64, S7-S74. (1985)(1.985). As decided by the Anderson Court, a reviewing court oversteps its bounds under Rule 52(a) n2 if it undertakes to duplicate the role of the lower court." Id.

It is clear by filing this appeal, and submitting their brief in support of this matter, that the defendant, Yale, is attempting to take a second bite at the apple in an attempt to convince the court that the trial court was incorrect in its factual analysis. Repeatedly, Yale takes the position that the court inappropriately or improperly evaluated the testimony of the witnesses in applying the law. Any other attempt to overturn this matter is a thinly veiled attempt to reargue the facts. It is therefore respectfully submitted that this appeal must be denied, and the trial court's decision affirmed, based upon the appropriate standard set forth above. Simply, the trial court in a well reasoned and well thought out opinion, has determined that Wawel should be the prevailing party based upon an analysis of the trial exhibits, witness testimony, existing agreements, and the appropriate application of relevant law.

## II.   WAWEL HAS A SUPERIOR PRIORITY INTEREST OVER YALE'S UCC FILING

Under New Jersey law, a security interest that is perfected first will have priority. The pertinent statute states "[conflicting] perfected security interests... rank according to time filing or perfection." N.J.S.A. 12A:9-322(a). Therefore, Plaintiff, who perfected its lien one year prior to Yale, clearly has a superior security interest by virtue its earlier UCC-1 filing date.

It is Yale's position that the factoring of the accounts receivable constituted a sale of the Accounts Receivable not subject to Wawel's priority interest. The Trial Court made a detailed evaluation of the analysis set forth in Yale's appeal brief - and determined that its analysis was inapplicable. The trial court relied first upon the provisions of Article 9 of the Uniform Commercial Code. More particularly, the Court referred to N.J.S.A 12A:9-109(a) (1) and (3). The Trial Court first referred to Comment 4 of the official commentary to N.J.S.A. 12:9-109 (a) which states:

4. Sales of Accounts, Chattel Paper, Payment Intangibles, Promissory Notes, and Other Receivables. Under subsection (a) (3), as under former section 9-102, this Article applies to sales of accounts and chattel paper. This approach has generally been successful in avoiding difficult problem of distinguishing between transactions in which a receivable secures an obligation and those in which the receivable has been sold outright. In many commercial financing transactions the distinction is blurred.

Subsection (a) (3) expands the scope of this Article by including the sale of a "permanent intangible" (defined in Section 9-102, as "a general intangible under which the account debtor's principal obligation is a monetary obligation") and a "promissory note" (also defined in Section 9-102). To a considerable extent, this article affords these transactions treatment identical to that given sales of accounts and chattel paper. In some respects, however, sales of payment intangibles and promissory notes are treated differently from sales of other receivables. See e.g., Sections 9-309 (automatic perfection upon attachment), 9-408 (effect of restrictions on assignment). By virtue of the expanded definition of "account"(defined in section 9-102), this Article now covers sales of and other security interest in) "health- care-insurance receivables" (also defined in section 9-102). Although this Article occasionally distinguishes between outright sales of receivables and sales that secure an obligation, neither this Article nor the definition of "security interest' (Section 1-201 (37)) delineates how a particular transaction is to be classified. That issue is left to the courts. (Emphasis Added).

(See Memorandum Opinion of the Honorable Michael S. Kaplan, U.S.B.J. dated September 28, 2007, at pages 10-11). The Court noted that while the UCC provisions apply to both sales and security transfers of accounts receivable, the UCC does not address or provide guidance on sale/financing characterization. The Court stated:

"Indeed, Comment 5 to 9-109 makes it clear that the applicability of Article 9 to the sales of accounts is wholly irrelevant to any determination as to whether a particular loan transactions to be deemed a sale or the creation of a security interest securing a loan".

The trial Court quoted the appropriate language from Comment 5 to subsection 9 -109:

5. Transfer of Ownership in Sales of Receivables. A "sale" of an account, chattel paper, a promissory note, or a payment intangibles

includes a sale of a right in the receivable, such as a sale of a participation interest. The term also includes the sale of an enforcement right. For example, a "[p]erson entitled to enforce" a negotiable promissory note (Section 3-301) may sell its ownership rights in the instrument. See Section 3-203, Comment 1 ("Ownership rights in instruments may be determined by principles of the law of property, independent of Article 3, which do not depend upon whether the instrument was transferred under Section 3-203.") Also, the right under Section 3-309 to enforce a lost, destroyed, or stolen negotiable promissory note may be sold to a purchaser who could enforce that right by closing the seller to provide the proof required under that section. This Article rejects decisions reaching a contrary result, e.g nothing in this section for any other provision of article mind prevents the transfer of full and complete ownership of an account, chattel paper, and instrument, or a payment intangibles in a transaction on sale. However, as mentioned in Comment 4, neither this article nor the definition of "security interest" in Section 1-201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation. This article applies to both types of transactions. The principal effect of this coverage is to apply this article's perfection and prior rules to the sales transactions. Use of terminology such as "security interest," "debtor," and "collateral" is merely a drafting convention adopted to reach this end, and its use has no relevance to distinguishing sales from other transactions. See PEB Co9mmentary No. 14.

Following a debtor's outright sale and transfer ownership of a receivable, the debtor-seller retains no legal or equitable rights in the receivable that has been sold. See Section 9-318(a). This is so whether or not the buyer security interest is perfected. (A security interest arising from the sale of a promissory note or payment intangibles is perfected upon attachment without further action. See Section 9-309.) However, if the buyer's interest in accounts or chattel paper is unperfected, a subsequently creditor, perfected secured party, or qualified buyer can reach the sold receivable and receive priority over (or take free of ) the buyer's unperfected security interest under Section 9-317. This is so not because the seller of a receivable retains rights in the property sold; it does not. Nor is this so because the seller of the receivable is a "debtor" under this Article (they are). It is so for the simple reason that Section 9-318(b), 9-317, and 9-322 make it so, as did former Sections 9-301 and 9-312. Because the buyer security interest is unperfected, for purposes of determining the rights of creditors of and purchases for value from the debtor-seller, under Section 9-318(b) the debtor-seller is deemed to have the rights and title it

> sold. Section 9-317 subject the buyer is unperfected interest in
> accounts and child paper to that of the debtor-seller's lien creditor
> and other persons who qualify under that section. (Emphasis
> Added.).

(See Memorandum Opinion as page s 12-13).

The Trial Court determined that neither this Article nor the definition of "security

interest" in Section 1-201 provided guidance as to the characterization of the factoring

relationship. The Trial Court applied "judicially created criteria" in order to characterize the

transactions. The Court determined that there was no doubt that the language of the Factoring

and Security Agreement in this matter as well as the conduct of the parties themselves,

demonstrated that the parties intended that the agreement be a "true sale" of the debtor's

accounts receivable.

After determining that a "true sale" occurred in this matter, the Court reviewed the facts

in reaching its final conclusion – determining that this was a fact sensitive relationship. The

Trial Court accentuated that the parties did not dispute that Wawel had perfected its security

agreement by filing Uniform Commercial Code financing statements ("UCC-1") with the New

Jersey Department of Treasury and the Bergen County Clerk's Office. The Trial Court

determined that having filed its financing statements later than those of Wawel "Yale may

prevail only if they can demonstrate that it maintains a priority position as a matter of law despite

Wawel's "first in time" filed UCC-1."

At trial and in this appeal Yale takes the position that Wawel consented to JTTT's sale of

its accounts receivable to Yale free of Wawel's security interest. In responding to this issue, the

Trial Court relied on its analysis of N.J.S.A 12A: 9-315 which states in relevant part:

> (a) Disposition of collateral: continuation of security interest or
> agricultural lien; proceeds. Except as otherwise provided in this

chapter and in 12A:2-403(2):

> (1)     a security interest or agricultural lien continues in
> collateral notwithstanding the sale, lease, license, exchange, or other
> disposition thereof unless the secured party authorized the disposition
> free of the security interest or agricultural lien....

N.J.S.A 12A:9-315.

As it did at the trial level, Yale has cited a litany of cases in which courts have found that

a secured party consented to the disposition of his collateral free of its security interest. The

Trial Court in reference to these cases provided by Yale, set forth the following:

> ...The voluminous case law submitted by Yale, however, offers the
> Court little assistance inasmuch as these cases present fact patterns
> differing significantly from the present matter.     Therefore, in
> determining whether Yale has sustained its burden with respect to
> while Wawel's alleged consent, the Court undertakes a case by case
> examination by evaluating the facts and evidence presented.
> In this case, the Court is satisfied that a determination of
> whether Wawel "consented" to or "authorized" Yale's use of his
> collateral is a determination that must be made by weighing the
> applicable evidence under these individuals set of facts. In marked
> contrast to the case at bar, most, if not all, of the cases cited by Yale
> were bottomed on circumstances in which a secure party knew of or
> became aware of the fact that their collateral was the being disposed
> of by the debtor. In many of these cases, for example, the secured
> collateral at issue included livestock, farm products, machinery or
> equipment - all of which a secured party knew were being liquidated
> by sale, auction, or the like. In that regard, the secured party was on
> notice that the proceeds generated by the disposition of the collateral
> were traceable to the specific collateral.

(Memorandum Opinion at page 17 -18).

The same analysis is applicable herein.  The litany of cases supplied by Yale refer to

transactions in which there was the disposal of goods in the normal course of business.  This

included collateral such as livestock, milk, farm goods, etc. all of which were collateral sold in

the normal course of the debtor's business.  The Trial Court acknowledged that this was a

significantly different transaction. In fact, the Trial Court determined that analysis was required to determine the actual factoring relationship between the parties. This required an analysis of the credibility of the witnesses during which the Court determined that the factoring agreement alone was not sufficient to establish that the factoring agreement was similar to a transaction involving livestock and farm goods. It is clear that the credibility of the witnesses became significant to determine whether or not the Accounts Receivable represented the type of good in which Wawel could have known or expected a possible intervening lien. The Court determined that it was not. The Trial Court then conducted its analysis to determine whether or not Yale constituted a holder in good in due course discussed below.

Quite simply, Yale is once again taking a "second bite at the apple" attempting to overturn the Court's analysis on a factual basis rather than determining that there was an error in the Court's analysis of applicable law.. For this reason alone Yale's appeal should be denied.

## III. YALE CANNOT QUALIFY AS A HOLDER IN DUE COURSE AND IS THEREFORE SUBJECT TO WAWEL'S LIEN

Yale, in its appeal attempts to argue that the trial Court, in evaluating the credibility of the witnesses incorrectly determined that Yale was not a Holder in Due Course. In a tortured interpretation of the facts, Yale sidesteps the issue of the negligent manner in which it conducted the search (under the wrong name) — and, in fact, appears not to have conducted the UCC search at all. (At trial, Yale was able to produce a complete file of searches conducted after the closing of the Factoring Agreement — yet was unable to produce a search conducted at the time of the closing, nor did Yale produce a bill, or other record from their search company confirming that such a search had been conducted). This became a determining point by the Trial Court which concluded that Yale had failed in its duty to protect its own interests. The Court stated:

This Court remains at a loss to understand how and/or why the Dun & Bradstreet search failed either to disclose Wawel's filing or identify "Jersey Tractor Trailer Training, Inc." as a related entity to be searched further. Neither party adequately explained this significant omission by a reputable search firm. Notwithstanding, this search failure is of no moment because <u>it was incumbent upon Yale, as a participant in the financial lending community, to review the search results and undertake all necessary follow-up. Indeed, a search of JTTT, revealing no significant secured bank debt, at a time when thecompany faced liquidity issues necessitating the use of a factor, should have raised red flags. This Court can only assume that Mr. Perkal's admitted inexperience in the factoring industry played a role in the oversight. Moreover, Yale's inability to produce any documentation to support Mr. Perkal's testimony that he had secured a lien search at the inception of the factoring relationship (e.g.- a search report, invoice, receipt, or correspondence) undercuts Mr. Perkal's credibility and confirms the reckless manner in which the factoring relationship was pursued by Yale.</u>

<u>In light of the foregoing, this Court finds that Yale failed to observe reasonable commercial standards of fair dealing when it conducted a series of UCC searches on "Jersey Tractor Trailer Training," the incorrect corporate name.</u> Consequently, Yale is not a "holder in due course," as it cannot satisfy the "good faith" requirement of <u>N.J.S.A.</u> 12A:3-302.

(See Memorandium Opinion at page 25).

Yale, by its own stipulation acknowledged at the time of trial that Wawel held "a prior lien toYale's UCC-1 Financing Statement. Wawel's lien was perfected prior to Yale's UCC-1 Financing Statement." See Plaintiff's Stipulated Facts and Conclusions of law with hand written notations of Cory Grey, Esq., counsel to Yale.

ACTUAL KNOWLEDGE:

The Trial Court conducted an analysis of the credibility of the witnesses. The Court referred to the testimony of Wawel's chief witness, Robert Ranzinger, Sr., in glowing terms. The Court stated:

As the trier of fact, this Court assesses the credibility of the trial witnesses. In doing so, the Court finds the testimony of Mr. Ranzinger, the President and CEO of Wawel, to be highly credible. The Court perceives Mr. Ranzinger as an experienced banking official, personally involved in all aspects of banking services and customer relations. To this day, Mr. Ranzinger has demonstrated an intent to support and assist Wawel's customers, even in difficult financial times. Indeed, the record reflects that Mr. Ranzinger, up until the bankruptcy filing, engaged in extensive efforts to negotiate and facilitate a resolution of the Debtor's financial quagmire, and continues to offer Wawel's support throughout the Chapter 11 proceedings. In marked contract, this Court regards the testimony offered by William Oliver to be of little evidentiary value. Indeed, by his own testimony and actions, Mr. Oliver has made clear that he would say or do anything to support his business. Consistent with this approach, Mr. Oliver concealed from both Wawel and Yale the competing financial accommodations. Thus this Court will accord little, if any, weight to Mr. Oliver's testimony.

It is manifestly evident that the factoring agreement between Yale and JTTT was an extraordinary business arrangement of which the Court is satisfied, based upon the trial testimony, that Wawel had no actual notice. It is clear from the testimony of Mr. Ranzinger that the December 9, 2005 meeting between Mr. Ranzinger and Mr. Oliver was the first time that Mr. Ranzinger knew that JTTT was utilizing Yale as a factor. In point of fact, Mr. Oliver purposely concealed from Wawel, as well as his own accountant, the agreement between Yale and JTTT, knowing full well that the agreement would not be acceptable to Wawel. It follows, therefore, that Wawel could not possibly have known which monies given to it by JTTT were actual proceeds traceable from JTTT's factoring agreement with Yale. Plaintiff has not introduced sufficient oral or documentary evidence to contradict Mr. Ranzinger's testimony that he never discussed the factoring relationship with Mr. Perkal prior to December 9, 2005 meeting.

(See Memorandum Opinion at page 18-19).

The Appellant ignores this clear determination with regard to the credibility of the witnesses choosing rather to obfuscate this determination and provide its own tortured analysis of what transpired. The Appellant refers specifically to various wire transfers that were provided by Yale to a bank providing wire transfer services for Wawel. The Appellant argues that this

provides both constructive and actual notice of the factoring relationship between Yale and

JTTT.

The Trial Court's analysis was clear. The Trial Court indicated at pages 19 and 20 of its

decision, the following language:

> The Court also finds unavailing the argument presented by Yale
> that Wawel knew of the Factoring Agreement by virtue of certain
> wire transfers. The testimony of Mr. Ranzinger indicates that
> although wire transfer notices were received by Wawel, the notices
> were handled by lower-level employees whose job was to simply
> ensure that the transfers were credited to a particular customer's
> account. Mr. Ranzinger further testified that although he had
> authority to deal with said wire transfers, he would not receive
> them in his capacity as bank president. Accordingly, the Court
> will not impute knowledge of the JTTT/Yale Factoring Agreement
> to Wawel simply because clerical employees at Wawel were
> aware that JTTT's account was, at times, credited with certain wire
> transfers originating from Yale.

Once again, the Appellant chooses to ignore this clear credibility analysis and present to this

Court a tortured analysis of the facts. This is not standard on this appeal in the appeal should be

denied simply for this reason.

Despite full and actual knowledge of the existence of Wawel's prior lien, Yale proceeded

with the closing of the factoring agreement with JTTT.

IMPUTED KNOWLEDGE

Under Article 3, good faith is defined as "honesty in fact in the observance of reasonable

commercial standards of fair dealing." The record is clear - in conducting its extremely limited

due diligence, Mr. Perkal acknowledged two facts. First, that it was Yale's common practice as a

factor to conduct a UCC search to determine whether there were any prior liens prior to entering

into a factoring relationship with a potential client. This was Yale's practice consistent with

industry standards. Mr. Perkal acknowledged that this was the first training he received while

29

with Yale. The second was a requirement that Yale receive three months' bank statements from the potential client. Both of these standards were violated herein.

Mr. Perkal acknowledged at trial, that he received two bank statements from JTTT. This was less than the minimum they would require. Further, these bank statements reveal a recurring payment to Wawel which Mr. Perkal recognized would be relevant to his analysis. These were disregarded.

The most significant issue arises from the fact that Yale was unable to produce at trial the UCC search conducted prior to the closing. Mr. Perkal's dubious explanation – it was simply missing from the file. Mr. Perkal, although this was never stated, wanted the Trial Court to believe that Yale's filing system had resulted in the loss of this documentation. However, Yale was able to produce from their file Dunn and Bradstreet UCC searches from later periods of time upon redirect examination by Mr. Grey. In fact the record reflects that they produced six separate UCC searches all for periods of time well after the closing. Even more telling was the fact that the Court was advised that these searches were merely representative and that there were many more in the file. Apparently, Yale's filing was sufficient to produce these records but was insufficient to produce the most significant UCC search to this matter - the one conducted prior to the closing.

As set forth above, Yale is required to establish that it is a holder in due course and is charged with the burden of doing so. By obtaining this easily sought documentation, Yale could have established that the search was actually conducted. At trial Mr. Perkal acknowledged the following: 1) the factoring agreement executed by JTTT was prepared by Yale; 2) the factoring agreement and all documents relating thereto, and prepared by Mr. Perkal, clearly an authorized representative of Yale, trained by Yale, referred to the entity known as Jersey Tractor Trailer

Training, Inc; 3) the name Jersey Tractor Trailer Training, Inc. was known to Harry Perkal of

Yale as he prepared all documents in their name; 4) the alleged Dunn & Bradstreet Report run

by Yale with regard to JTTT (if we were to assume arguendo that it did in fact exist) was not run

with regard to the entity known as Jersey Tractor Trailer Training, Inc. (once again, assuming

that the later run UCC searches were run in the same name as testified to by Mr. Perkal); 5) as

acknowledge by Mr. Perkal at his deposition and a trial upon cross-examination, if a Dunn &

Bradstreet report had been run with regard to Jersey Tractor Trailer Training, Inc., the search

would have disclosed the UCC-l's filed by Wawel; 6) as acknowledged by Mr. Perkal at his

deposition and upon cross-examination, if Yale had been aware of the UCC filing by Wawel, it

would have had to enter into a priority agreement or have paid off Wawel's loan to JTTT in order

to obtain a first lien position, consistent with Mr. Perkal's training by Yale; and finally 7) as

testified to by Mr. Perkal, Yale acknowledged that it now uses I-Lien and Dunn & Bradstreet to

conduct such UCC searches due who to Dunn & Bradstreet's failure to recognize Wawel's prior

lien.

Mr. Perkal's explanation - I simply made a mistake. I simply typed in the wrong name.

The trial Court refused to accept this incredible statement.

Under N.J.S.A. 12A:3-302, a "holder in due course" is defined as follows:

> a. Subject to subsection c. of this section and subsection d. of
> 12A:3-106, "holder in due course" means the holder of an
> instrument if:
> (1)    the instrument when issued or negotiated to holder does
> not bear such apparent evidence of forgery or alteration or is not
> otherwise so irregular or incomplete as to call into question its
> authenticity; and
> (2)    the holder took the instrument for value, in good faith,
> without notice that the instrument is overdue or has been
> dishonored or that there is an uncured default with respect to
> payment of another instrument issued as part of the same series,
> without notice that the instrument contains an unauthorized

> signature or has been altered, without notice of any claim to the instrument described inl2A:3-306 [Claims to an instrument], and without notice that any party has a defense or claim in recoupment described in subsection a. of 12A:3-305.

N.J.S.A. 12A:3-302.

Therefore, in order for Yale to be considered a "holder in due course" it must demonstrate that it took the invoices of JTTT's accounts receivable (1) for value; (2) in good faith, and (3) without notice of Wawel's security interest or claim to the instrument. Furthermore, the determination of whether Yale is a "holder in due course" directly affects whether Yale may take priority Wawel as a purchaser of an instrument under N.J.S.A. 12A:9-30 and 9-331.

The Trial Court indicated that in order to assess whether Yale qualified as a "holder in due course" it was required to determine whether JTTT's accounts receivable were considered "instruments" for purposes of N.J.S.A. 12A:3-302. The Trial Court referred to N.J.S.A 12A:9-102(7), and accepted for purposes of discussion that the accounts receivable were instruments subject to a "holder in due course" analysis under N.J.S.A. 12A:3-302. The Trial Court further referred to Comment 5 to N.J.S.A 12A:9-331, it extensively cited the following language:

> 5. Collections by Junior Secured Party. Under this section, a secured party with a junior security interest in receivables (accounts, chattel paper, promissory notes, or payment intangibles) may collect and retain the proceeds of those receivables free of the claim of a senior secured party to the same receivables, if that junior secured party is a holder in due course of the proceeds. In order to qualify as a holder in due course, the junior must satisfy the requirements of section 3-302, which include taking "in good faith." This means that the junior party not only must act "honestly" but also must observe "reasonable commercial standards of fair dealing" under the particular circumstances. See section 9-102(a). Although "good faith" does not impose a general duty of inquiry, e.g., a search of the records in filing offices, there may be circumstances in which "reasonable commercial standards of fair dealing" would require such as search.
> Consider, for example a Junior secured party in the business of financing or buying accounts who fails to undertake a search to

determine the existence of prior security interests. Because a search, under the usages of the trade of that business, would enable it to know or learn upon reasonable inquiry that collecting the accounts violated the rights of a senior secured party, the junior may fail to meet the good-faith standard. See Utility Contactors Financial Services, Inc. v Amsouth Bank, NA, 985 F.2d 1554 (11th Cir. 1993)...

Whether the junior secured party qualifies as a holder in due course is fact-sensitive and should be decided on a case-by-case basis in the light of those circumstances.
The concepts addressed in this comment are also applicable to junior secured parties as purchasers of instruments under section 9-330(d). See section 9-330, comment 7. N.J.S.A. 12 A: 9-331.

(See Memorandum Opinion at pages 22-23).

In providing its analysis the Trial Court made the following conclusions:

(a) "For Value:"

As it was undisputed that Yale had paid money to JTTT before taking each Accounts Receivable, the Trial Court determined that Yale took each Factored Account from JTTT for value.

(b) "Good Faith"

The Court appropriately defined good faith pursuant to N.J.S.A 12A:9-102(43) as "honesty in fact and the observance of reasonable commercial standards of fair dealing." The Court relied upon the case of Triffin vs. Pomerantz Staffing Services, L.L.C., 370 N.J. Super. 301 (App. Div. 2004), as controlling. Therein the New Jersey Appellate Division stated:

...[a] party who fails to make an inquiry,reasonably required by the circumstances of the transaction, so as to remain ignorant of the facts that might disclose a defect cannot claim to be a holder in due course.

The Trial Court in this matter relied on the following language from Triffin:

It is reasonable, in considering whether the instruments were received in good faith and whether the holder comported with

33

> reasonable commercial standards, that the holder be expected to
> fully examine the front and back of the instrument and, where the
> instrument purports to contain a method by which its authenticity
> may be tested, that the holder actually utilized that method. While
> this failure would likely preclude any holder of these instruments
> from claiming holder in due course that is, it particularly precludes
> entities in the business of cashing checks.

Triffin, 370 N.J. Super 301, at 309-310.

The Trial Court in making its analysis relied heavily upon Triffin, supra, providing the

following factual analysis:

> ... the Court finds it is not unreasonable to expect Yale, as an entity
> who's sole business is the factoring of Accounts Receivable, do not
> only utilize the correct search method, but to conduct a proper UCC
> search of the Debtor, including JTTT's corporate name. Indeed, Mr.
> Perkal acknowledged the importance of a proper search when he
> testified that had Yale been aware of Wawel's UCC filing, it would
> have sought to enter into a subordination agreement or have paid off
> Wawel's loan to JTTT.

Simply, the Trial Court, in providing this analysis of credibility and indicating its

complete surprise at the actions of an entity involved in the factoring of Accounts Receivable,

determined that Yale was not a holder in due course. The Appellant's failure to recognize this

evaluation of both credibility and the law, is simply a convoluted attempt to take a "second bite

at the apple".

As further support for the Trial Court's position the Respondent cites the following:

In the matter of In re Joe Morgan, Inc. vs. AmSouth Bank, N.A., 985 F.2d 1554, (United

States Court of Appeals, 11th Cir. 1993), the Court addressed a factor which brought an

adversary proceeding seeking a determination as to the of its claim to processes arising from a

collection of the debtor's accounts receivable. The Court of Appeals on the 11th circuit

determined that the factor was not a holder in due course. The Court stated:

> The record also contains no evidence from which the trial court
> could have concluded that Familian took the joint checks from
> Pima with "notice" of a "claim to it on the part of any person."
> "Notice" entails "actual knowledge of a defense or of such facts
> that would alert a [holder] to a possible defense." Stewart v.
> Thornton, 116 Ariz. 107, 109, 568 P.2d 414, 416 (1977). But see E.
> Bierhaus & Sons, Inc., v. Bowling, 486 N.E.2d 598 (Ind. App.
> 1985) (failure to inquire precludes holder in due course status were
> circumstances would put reasonable person on inquiry)...

The Court in Familian also distinguished New Hampshire Business Development Corp.

v. F.R. Lepage Bakery. Inc., 832 F.2d 7 (1st Cir. 1987). There, the debtor defaulted on its loans

from both the senior secured creditor and the junior secured creditor. Id. at 9. The junior creditor,

knowing about the prior perfected security interests, instructed the debtors account debtors to

make payments directly to the junior creditor. Id. The senior creditor discovered this

arrangement, informed the junior creditor of its rights to the Accounts Receivable, and ordered

the junior creditor to cease collecting on the accounts. Id. the junior creditor ignored the senior

creditor and entered into a factoring agreement under which it collected on the accounts. Id. The

junior creditor also ignored the senior creditor's numerous requests for accounting of the

proceeds collected by the junior creditor..." Id.

Yale has also relied upon numerous cases that have nothing to do with this matter in an

attempt to substantiate that it is a holder in due course. For example, in prior submissions, Yale

has relied upon numerous cases in which the holder in due course acquired inventory of the

company that was sold in the normal course of business. In Moffat County State Bank vs.

Producers Livestock Marketing Association, 598 F. Supp. 1562, (U.S.D.C, D. Colorado, 1984),

previously cited by Yale, the court addressed a holder in due course will acquired cattle from a

livestock sale barn. The court stated:

> ...it is undisputed that the cattle sold by Producers were farm

> products and that Seewald was a person engaged in farming
> operations. It is similarly undisputed that Producers was a buyer in
> the ordinary course of business.

This is consistent with the matter of <u>Parkersburg State Bank vs. Swift Independent Packaging Company,</u> 764 F.2d 512 (United States District Court of Appeals, 8th Cir. 1985), also cited by Yale in earlier submissions where the Court once again addressed the sale of cattle. The case involved the sale of cattle by a farmer to a packing company in the ordinary course of business. The farmer was in the business of selling cattle and the packing company purchased the cattle in the ordinary course of business.

In <u>Planters Production Credit Association vs.</u> Bowles, 511 S.W.2d 645 (Supreme Court of Arkansas, 1974), the Court addressed a security interest on cotton which was raised by the debtor which had been purchased by Keiser Supply Company in the ordinary course of business. See also, <u>Anon, Inc. vs. Farmers Production Credit Association,</u> 446 N.E. 2d 656 (Ind. App. 1983) (in that matter the creditor sold hogs in his normal course of business.); <u>U.S. v.</u> <u>Central Livestock Ass'n,</u> 349 F. Supp. 1033 (D.C. North Carolina 1972). Yale has relied upon the matter of <u>Cessna Finance Corporation vs.</u> <u>Skyways Enterprises, Inc.,</u> 580 S.W.2d 491 (Kentucky, 1979) for the proposition that there was no obligation to conduct the UCC search. The court once again relied on the fact that the debtor "was in the business of selling aircraft. The sale to Skyways occurred in the ordinary course of its business. Clearly, Skyways was a buyer in the ordinary course of business. It purchased the aircraft in good faith without knowledge that the sale was in violation of any security interest held by Cessna aircraft." Once again, the case relied upon by Yale does not support its position. It cannot be asserted that JTTT was in the business of selling Accounts Receivable. As this court is aware, JTTT was only involved in the education and training of tractor-trailer drivers.

## CONCLUSION

Based upon the foregoing it is respectfully submitted that the application of appellant should be denied and that the Appellants appeal must be denied,. This application is a thinly veiled attempt to convince another Court that The Trial Court's analysis was incorrect, despite the Trial Court's ability to evaluate the credibility of witnesses, and documents, and therefore is without merit.

LAW OFFICES OF DENNIS A. MAYCHER, P.C.
Attorneys for Creditor, Wawel Savings Bank

By: _____
THOMAS P. MONAHAN, JR.

Dated: May 28, 2008