**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Bankruptcy No. 06-12743 (MBK) |
| JERSEY TRACTOR TRAILER | : | |
| TRAINING INC., | : | Adv. Proc. No. 06-2003 (MBK) |
| | : | |
| Debtor. | : | |
| | : | |
| YALE FACTORS NJ LLC, | : | |
| | : | CIVIL ACTION NO. 07-5853 (MLC) |
| Appellant, | : | |
| | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | |
| WAWEL SAVINGS BANK, et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |

**COOPER, District Judge**

Jersey Tractor Trailer Training Inc. ("Debtor") filed a
voluntary bankruptcy petition under chapter 11 of the United
States Bankruptcy Code, 11 U.S.C. § ("Section") 101, et seq.
("Bankruptcy Code"), on April 4, 2006.  Bankr. No. 06-12743, dkt.
entry no. 1, Pet.  Wawel Savings Bank ("Wawel") was listed on the
Debtor's "List of Creditors Holding 20 Largest Unsecured Claims".
Id., dkt. entry no. 20.  On June 29, 2006, Wawel commenced an
adversary proceeding against the Debtor and Yale Factors NJ LLC
("Yale") seeking a judgment declaring, inter alia, that (1) it
has "a valid and senior secured claim" against the Debtor, (2) it
has a lien secured by all of the Debtor's assets, (3) its lien on
the Debtor's assets has priority over Yale's alleged lien, (4)

any accounts receivable the Debtor factored to Yale are property of the Debtor's bankruptcy estate under Section 541(a), (5) all monies held in trust by Yale's attorney are subject to Wawel's first priority lien and such monies must be turned over to the Debtor, as well as all future proceeds of the Debtor's factored accounts receivable, (6) Wawel is entitled to a replacement lien "to compensate for any loss caused by Debtor's unauthorized factoring of certain accounts receivable to Yale or, in the alternative . . . [Wawel is entitled to] lien super priority status to the extent of its loss", and (7) Wawel is entitled to compensatory and punitive damages.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 1, Compl.

The United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court") conducted a trial on Wawel's claims on July 11 and 13, 2007.  Id., dkt. entry nos. 27, 28.  The Bankruptcy Court issued a written opinion on September 28, 2007 discussing its findings and conclusions ("9-28-07 Op.").  Id., dkt. entry no. 32, 9-28-07 Op.  Further, the Bankruptcy Court issued an order and judgment on October 21, 2007, which dismissed Wawel's tortious interference and conversion claims against Yale with prejudice, but entered judgment in favor of Wawel and against Yale with respect to Wawel's remaining claims ("10-21-07 Judgment").  Id., dkt. entry no. 34, 10-21-07 Judg.  Thus, the Bankruptcy Court ordered that Wawel is entitled to (1) a first

priority lien on all of the Debtor's outstanding accounts receivable, (2) receive all of the Debtor's accounts receivable held in the escrow accounts of either the Debtor's counsel or Yale's counsel "and an accounting of deposits to and distributions there from [sic]", and (3) receive the proceeds of all of the Debtor's outstanding accounts receivable until Wawel's lien is satisfied.  Id.  Yale appeals from the 10-21-07 Judgment, in effect, pursuant to 28 U.S.C. § 158(a).  (Dkt. entry no. 1, Not. of Appeal.)  For the reasons stated herein, the Court will affirm the 10-21-07 Judgment.

## BACKGROUND

Wawel is a federally chartered banking institution.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 1, Compl.  The Debtor entered into a loan agreement with Wawel on March 7, 2002, pursuant to which Wawel loaned the Debtor the principal amount of $315,000 (the "Loan").  See id., dkt. entry no. 32, 9-28-07 Op., at 3; Pl. Trial Ex. P7, 3-7-02 Note.  The Loan was to be repaid over a term of seven years at an annual interest rate of 12%. See Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 3; Pl. Trial Ex. P7, 3-7-02 Note.  The note, which sets forth the Debtor's obligations with respect to the Loan, states that it is separately secured by a "UCC-1 (1st position) on all assets of the Borrower[,] Life Insurance Policy on William B. Oliver[,] 100% of the issued and outstanding stock of the

3

Borrower". Pl. Trial Ex. P7, 3-7-02 Note. Moreover, the
security agreement entered into in connection with the Loan
states that Wawel has a security interest in all of the Debtor's
inventory, equipment, accounts, instruments, documents, chattel
paper and other rights to payment, general intangibles,
government payments and programs, and all proceeds and products
thereof. Pl. Trial Ex. P8, 3-7-02 Security Agmt.

Wawel filed a Uniform Commercial Code ("UCC") financing
statement covering all of the Debtor's assets with the New Jersey
Department of Treasury on May 24, 2002 and the Bergen County
Clerk's office on June 12, 2002. Bankr. Adv. Proc. No. 06-2003,
dkt. entry no. 32, 9-28-07 Op., at 4; Pl. Trial Exs. P9 & P10,
UCC-1 Financing Stmts. Specifically, the UCC-1 financing
statements state that they cover:

> [a]ny and all assets of the Debtor(s) herein including,
> but not limited to, the following; any and all
> inventory, goods, improvements, personal property of
> any nature or description, Chattel Paper, Accounts,
> Accounts receivable, contract rights, Equipment,
> General Intangibles and fixtures, all accessions,
> attachements [sic], tools, parts, supplies, increases,
> additions, replacements, and substitutions relating to
> any of the foregoing, whether any of the foregoing is
> owned now or acquired later, all proceeds relating to
> any of the foregoing (including proceeds of sale,
> insurance, general intangibles, instruments, rents,
> monies, payments and other accounts [sic] proceeds)
> located at, or used in connection with, the business or
> other operation of the debtors.

Pl. Trial Ex. P9, N.J. UCC-1 Financing Stmt.; see Pl. Trial Ex.
P10, Bergen County UCC-1 Financing Stmt. (containing
substantially similar collateral description).

The Debtor entered into a Factoring and Security Agreement with Yale on March 20, 2003 "under which Yale purchased account receivables from [the Debtor] pursuant to absolute assignments and gave value in exchange in the form of monetary advances" ("Factoring Agreement").  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 5; Pl. Trial Ex. P13, Factoring Agmt.; Defs. Trial Ex. D3, Factoring Agmt.  (Yale Br., at 12.) Yale hired Dun & Bradstreet to conduct monthly financing statement searches, but in performing such searches Dun & Bradstreet omitted "Inc." from the Debtor's legal name.  (Yale Br., at 12.)  See Defs. Trial Ex. D2, 5-8-03 & 3-2-06 Dun & Bradstreet UCC-1 Lien Search Results for "Jersey Tractor Trailer Training".  Yale's searches did not reveal Wawel's UCC-1 financing statements, and thus, Yale was not aware of Wawel's security interest in the Debtor's assets at the time it entered into the Factoring Agreement and for several years thereafter. (Yale Br., at 12-13.)

Yale contends, however, that Wawel knew that Yale was purchasing the Debtor's assets on November 7, 2003, if not earlier, but did not inform (1) Yale of its security interest in all of the Debtor's assets until December 20, 2005, or later, or (2) the Debtor that it should cease factoring its accounts receivable.  (Id. at 14.)  Wawel contends, in contrast, that it did not discover that the Debtor was factoring its accounts

5

receivable until December 9, 2005, and did not learn the approximate amounts the Debtor owed to Yale or the interest rates and fees Yale charged the Debtor until the parties held a meeting on December 20, 2005.  (Wawel Br., at 4, 8.)

Wawel's president and chief executive officer, Robert Ranzinger ("Ranzinger"), testified that Wawel maintains an account at the Federal Home Loan Bank ("FHLB") and Wawel's customers may have funds wired directly into this account. Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 6.  Ranzinger further testified that (1) such wire transfers are handled by low level clerical staff members, who assure that the wire transfers are credited to customer accounts, (2) he designated four officers as the only persons with authority to deal with the FHLB because the wire transfers needed to be addressed quickly and responsibly, and (3) he executed a Wire Transfer Authorization and Agreement Form on March 11, 2002 on behalf of Wawel, which required the FHLB to notify one of the four designated Wawel officers by telephone when it received a wire transfer into Wawel's account.  Id. at 6-7.  (Yale Br., at 15.)  The FHLB regularly received wire transfers into its Wawel account from Yale's bank.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 8.  (Yale Br., at 17.)  These wire transfers were accompanied by instructions directing the FHLB to credit the funds to Wawel's account for the ultimate benefit of

6

the Debtor, and notify Wawel of the credits by contacting
Ranzinger.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-
28-07 Op., at 8.  (Yale Br., at 17 (arguing that during the
trial, Yale demonstrated through a sample wire transfer history
report that the sending entity would be Yale, the receiving bank
was the FHLB for credit to the account of Wawel "ATTN: Robert
Ranzinger", and the listed beneficiary of the transfer was the
Debtor).)

Ranzinger met with the Debtor's president, William Oliver
("Oliver"), on December 9, 2005, to discuss the Debtor's checking
account because it had a low balance.  Bankr. Adv. Proc. No. 06-
2003, dkt. entry no. 32, 9-28-07 Op., at 8.  (Wawel Br, at 4.)
Thereafter, representatives of Wawel, Yale, and the Debtor held a
meeting on December 20, 2005.  Bankr. Adv. Proc. No. 06-2003,
dkt. entry no. 32, 9-28-07 Op., at 8.  (Wawel Br., at 4.)  At
this meeting, Ranzinger advised Yale of its first priority lien
on all of the Debtor's assets, including accounts receivable, and
objected to Yale's factoring of the Debtor's accounts receivable.
Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at
8-9.  (See Wawel Br., at 4.)  Following the December 20, 2005
meeting, Yale conducted another UCC-1 lien search using the
Debtor's correct corporate name and discovered, for the first
time, Wawel's UCC-1 financing statements.  Bankr. Adv. Proc. No.
06-2003, dkt. entry no. 32, 9-28-07 Op., at 9.  On December 23,

2005, Ranzinger again told the Debtor's president that its Factoring Agreement with Yale was in violation of the loan agreement between the Debtor and Wawel.  Id.  Accordingly, the Debtor sent a letter to Yale on January 20, 2006, stating that it would not renew the Factoring Agreement when it terminated on March 20, 2006.  Id.  (Wawel Br., at 4.)

Yale continued its collection actions against the account debtors on the Debtor's accounts receivable.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-38-07 Op., at 9.  On March 8, 2006, the New Jersey Superior Court issued an Order to Show Cause with Temporary Restraints ("OTSC") at Yale's request, which ordered, inter alia, (1) the Debtor and Oliver to show cause why an order should not be entered "[d]eclaring that any and all of the funds and/or assets remaining in any accounts maintained and/or controlled by [the Debtor or Oliver] . . . should be delivered and properly should be in possession of [Yale] up to the amount of $700,000", and (2) all of the Debtor's customers that received a notice of assignment of accounts receivable to pay such accounts to Yale.  Pl. Trial Ex. P16, 3-8-06 OTSC, at 2, 4.  Yale did not notify Wawel of the OTSC until March 10, 2006. Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-38-07 Op., at 9.  Wawel "intervened in the action and certain accounts receivable payments received by Yale are now being held in the attorney trust account of its attorneys."  Id.  (Wawel Br., at

5.)  Shortly thereafter, the Debtor filed its voluntary chapter 11 bankruptcy petition.  See Bankr. No. 06-12743, dkt. entry no. 1, Pet.  Wawel commenced an adversary proceeding against Yale and the Debtor on June 29, 2006.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 1, Compl.  After conducting a trial on July 11 and 13, 2007, the Bankruptcy Court concluded that Wawel has a first priority lien on the Debtor's accounts receivable that is superior to Yale's lien on the accounts receivable, and thus, Wawel is entitled to recover the proceeds of such accounts receivable until its lien is satisfied.  Id., dkt. entry no. 32, 9-28-07 Op., at 2.

The Bankruptcy Court noted that the UCC does not address how to determine whether a transaction constitutes the sale of an account receivable or the financing of an account receivable. Id. at 11.  The Bankruptcy Court also noted that there are a series of factors used to determine whether an asset transfer constitutes a "true sale" or a transfer of collateral in connection with a secured financing.  Id. at 13-14 (citing D. Aicher & William J. Fellerhoff, Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor, 65 Am. Bankr. L.J. 181 (1991)).  Nevertheless, the Court concluded that although such factors "are helpful in cases where the intentions of the parties are not clearly expressed, the Court has no doubt that the language of the Factoring

Security Agreement in this case, as well as the conduct of the parties themselves, demonstrate that the parties intended that the agreement be a 'true sale' of certain of the Debtor's accounts receivable." Id. at 14-15 (listing relevant provisions from Factoring Agreement).

After determining that the factoring of the Debtor's accounts receivable constituted actual sales of those receivables, the Bankruptcy Court addressed the relative rights of Wawel and Yale to the proceeds of the factored accounts receivable. See id. at 15-26.  The court acknowledged that (1) the parties do not dispute that Wawel perfected its security interest by filing UCC-1 financing statements on May 24, 2002 and June 12, 2002, and (2) N.J.S.A. § 12A:9-315 provides that a security interest continues in collateral notwithstanding its sale "unless the secured party authorized the disposition free of his security interest." Id. at 15-17.  The Bankruptcy Court then considered the applicable evidence and stated that while it found Ranzinger's testimony to be highly credible, it found Oliver's testimony to be of little evidentiary value because he "made it clear that he would say or do anything to support his business." Id. at 18-19.

The Bankruptcy Court concluded that Wawel did not have actual notice of the Factoring Agreement between Yale and the Debtor until the meeting between Ranzinger and Oliver on December

10

9, 2005.  Id. at 19.  The Bankruptcy Court also concluded that
the FHLB wire transfers did not put Wawel on notice of the
Factoring Agreement because such transfers were handled by low-
level Wawel employees, who simply credited the particular
customer's account, and Ranzinger did not receive the information
pertaining to such transfers in his capacity as president.  Id.
at 19-20.  Last, the Bankruptcy Court held that Yale was not a
"holder in due course" entitled to take the factored accounts
receivable free of Wawel's security interest because it did not
satisfy the "good faith" requirement of N.J.S.A. § 12A:3-302.
Id. at 25.  Specifically, the Bankruptcy Court found that Yale
"failed to observe reasonable commercial standards of fair
dealing", a component of the good faith requirement, when it
conducted its UCC lien searches on "Jersey Tractor Trailer
Training", the incorrect corporate name of the Debtor.  Id. at
25.  Therefore, the Bankruptcy Court found that Wawel was
"entitled only to a judgment granting it entitlement to all
[accounts] receivable proceeds presently held in escrow, as well
as the proceeds of all outstanding accounts receivable."  Id. at
28 (explaining that the Debtor was "empowered" to use the
proceeds of its receivables "in any fashion it so desired" until
Wawel declared default, and thus, Wawel can only recover

receivables and proceeds that remained outstanding or readily identifiable when Wawel declared default).[1]

**DISCUSSION**

### I.   Jurisdiction and Standard of Review

A district court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees.  28 U.S.C. § 158(a).  A district court reviews a bankruptcy court's "legal determination de novo, its factual findings for clear error[,] and its exercise of discretion for an abuse thereof." In re Rashid, 210 F.3d 201, 205 (3d Cir. 2000); see Fed.R.Bankr.P. 8013 ("On appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous.")  Also, the Court, when addressing mixed questions of law and fact, divides the questions into their respective components and applies the appropriate standard to each.   In re Brown, 951 F.2d 564, 567 (3d Cir. 1991).

### II.  Standard of Review Applied Here

#### A.   Whether Wawel Authorized the Sale of Its Collateral

Yale notes that (1) Wawel admitted during the trial that its security agreement between it and the Debtor does not expressly

---

[1] The Bankruptcy Court also found Wawel's claims for tortious interference and conversion to be without merit, but such claims are not at issue in this appeal.  Id. at 26-28.

12

restrict or prohibit the sale of the secured collateral or the use of the proceeds of such collateral, and (2) the loan agreement between Wawel and the Debtor does not prohibit the Debtor from selling its accounts receivable or using the proceeds of its accounts receivable in ordinary business activities. (Yale Br., at 22-23.)  Yale argues that Wawel cannot permit the Debtor to sell the secured collateral and receive the proceeds of such sales, "and then, when it learns that its borrower is in financial extremis, emerge from the bushes and assert a continuing right to the collateral it permitted to be sold." (Id. at 22 (emphasis in original).)  Thus, Yale contends that the Bankruptcy Court should have concluded that Wawel consented to the Debtor's sale of its accounts receivable to parties such as Yale.  (Id. at 23-24.)

Yale also contends that "[i]n addition to the blanket consent admitted to by Wawel", Wawel also impliedly consented to the Debtor's sales of its accounts receivable to Yale because it knew, through its designated officers, about such sales and accepted the sale proceeds into its FHLB account.  (Id. at 25-27.)  Yale then discusses a number of cases in which the court concluded that a creditor, who had knowledge of a sale of its collateral but did not object to such sale, had impliedly consented to the sale free of its security interest.  (Id. at 29-35.)  Yale argues that even when a security agreement expressly

13

prohibits the sale of collateral without the creditor's consent, the secured party may authorize the sale of its collateral through its course of dealing with the debtor.  (<u>Id.</u> at 34-35.) Yale argues that Wawel knew that Yale was the Debtor's factoring company because (1) a Yale employee informed Ranzinger in late 2003, (2) Wawel received almost 200 wire transfers accompanied by a monthly report and telephone confirmations indicating that the money underlying these transfers came from Yale, and (3) Oliver visited Ranzinger in late 2003 and asked him how Yale could wire the Debtor's advances to Wawel.  (<u>Id.</u> at 35-36.)  Yale further argues that Wawel received Yale's wire transfers into its FHLB account for the benefit of the Debtor without invoking its security agreement, declaring a default, taking possession of the funds, or exercising any setoff rights.  (<u>Id.</u> at 36.)  Thus, Yale asserts that Wawel permitted the sale of its collateral impliedly or though its course of dealing with the Debtor, and thus, it waived or is estopped from asserting any security interest in the collateral Yale purchased from the Debtor.  (<u>Id.</u> at 37.)

Wawel, however, emphasizes that "[t]he litany of cases supplied by Yale refer to transactions in which there was the disposal of goods in the normal course of business", and the Bankruptcy Court explained that the factoring transaction at issue here was significantly different than a normal course of business transaction.  (Wawel Br., at 25.)  Wawel also emphasizes

that the Bankruptcy Court considered and weighed the credibility of the trial witnesses before determining that the Debtor's accounts receivable were not "the type of good in which Wawel could have known or expected a possible intervening lien."  (Id. at 26.)  Thus, Wawel contends that Yale does not allege that the Bankruptcy Court erred in analyzing the applicable law, but instead is attempting to take a "second bite at the apple" by having this Court revisit the Bankruptcy Court's factual determinations.  (Id.)

Chapter 9 of New Jersey's codification of the UCC, N.J.S.A. § 12A:9-101, et seq., which governs secured transactions, applies to, inter alia, any transaction that creates a security interest in personal property, as well as sales of accounts, chattel paper, payment intangibles, or promissory notes.  N.J.S.A. § 12A:9-109(a)(1), (3).  Official comment 2 to N.J.S.A. § 12A:9-109 states that "[w]hen a security interest is created, this article applies regardless of the form of the transaction or the name that parties have given to it."  Id., Official Cmt. 2. Similarly, official comment 4 provides that applying this article to sales of accounts "generally has been successful in avoiding the difficult problems of distinguishing between transactions in which a receivable secures an obligation and those in which the receivable has been sold outright."  Id., Official Cmt. 4.  Thus, neither N.J.S.A. § 12A:9-109 nor any other UCC provision provides

15

any instruction on how to differentiate between a sale transaction and a transaction that simply creates a security interest securing an obligation. Id., Official Cmt. 5. Nevertheless, the parties do not dispute the Bankruptcy Court's finding that the Debtor's transfer of its accounts receivable to Yale pursuant to the Factoring Agreement constituted "true sales", and not secured transactions. See Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 15. Accordingly, the Court, in addressing this appeal, accepts the Bankruptcy Court's conclusion that the Debtor sold its accounts receivable to Yale.

Wawel perfected its security interest in the Debtor's assets, including the Debtor's accounts receivable, by filing a UCC-1 financing statement with the New Jersey Department of Treasury on May 24, 2002 and a separate UCC-1 financing statement with the Bergen County Clerk's office on June 12, 2002. See id.; Pl. Trial Exs. P9 & P10, UCC-1 Financing Statements. See N.J.S.A. § 12A:9-310(a) (stating that "[e]xcept as otherwise provided . . ., a financing statement must be filed to perfect all security interests and agricultural liens"). Further, Yale filed a UCC-1 financing statement on March 26, 2003, which covered the accounts receivable underlying the Factoring Agreement. See Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 16. See N.J.S.A. § 12A:9-310(a); N.J.S.A. § 12A:9-109(a)(3) (stating that chapter 9 of New Jersey's UCC

16

applies to sales of accounts).  Thus, under the "first-to-file"
rule, Wawel's perfected security interest would have priority
over Yale's perfected interest in the Debtor's accounts
receivable because Wawel filed its financing statements first.
See N.J.S.A. § 12A:9-322(a)(1).  However, a creditor's security
interest in collateral may be severed following the sale of such
collateral if the creditor authorized the disposition of the
collateral free of its security interest.  N.J.S.A. § 12A:9-
315(a)(1) (stating that "a security interest . . . continues in
collateral notwithstanding sale, lease, license, exchange, or
other disposition thereof unless the secured party authorized the
disposition free of the security interest").  Accordingly,
Wawel's perfected security interest in the accounts receivable
the Debtor sold to Yale pursuant to the Factoring Agreement
continued following each sale unless Wawel authorized the
dispositions free of its security interest.  See id.

The Court agrees with the Bankruptcy Court that determining
whether a secured party expressly, impliedly, or through course
of dealing consented to the disposition of its collateral free of
its security interest requires a case-by-case examination of the
relevant facts and evidence.  See Bankr. Adv. Proc. No. 06-2003,
dkt. entry no. 32, 9-28-07 Op., at 17.  Here, Ranzinger testified
that from the time Wawel made the Loan to the Debtor in March of
2002 through 2003, he did not have any discussions with Oliver

regarding Yale, learn that a company named Yale existed, or have any contact with Yale's president, Harry Perkal ("Perkal").  Id., dkt. entry no. 41, 7-11-07 Trial Tr., at 54-55.  Further, Ranzinger testified, inter alia, that (1) Oliver first informed him that the Debtor was involved with "a factor" in late November or early December of 2005, (2) he did not know that Yale existed until he met with Oliver in late November or early December of 2005, (3) Oliver first provided him with a copy of the Factoring Agreement, via facsimile, in December 2005, (4) he reviewed the Factoring Agreement in December 2005 and informed Oliver that it was "very highly priced" and "not acceptable", (5) he held a meeting at Wawel with Oliver, Perkal, and the Debtor's accountant to discuss the Factoring Agreement on December 20, 2005, (6) during the December 20, 2005 meeting, he stated that the Factoring Agreement was not acceptable because the Debtor would not be able to accommodate all of its obligations to Wawel and Yale, and he informed Yale that Wawel had filed UCC-1 financing statements covering all of the Debtor's assets, (7) Perkal contacted him one or two days after the December 20, 2005 meeting and stated that Yale had confirmed that Wawel had, in fact, filed UCC-1 financing statements perfecting its security interest in the Debtor's assets, but somehow Yale's previous searches had not uncovered these financing statements, (8) he reiterated to Oliver following the December 20, 2005 meeting that the Factoring

18

Agreement was not acceptable to Wawel, and thus, the Debtor did
not renew the Factoring Agreement, (9) he "absolutely [did] not"
handle any wire transfers received by Wawel, but instead each
wire transfer was handled by a low-level clerk, who simply put it
into the correct customer account "[a]nd there's no reason for
even an officer to be involved in it", and (10) he was not aware
that Yale was sending wire transfers to Wawel's FHLB account on
the Debtor's behalf.  Id. at 56-58, 60-65, 68-70, 75, 77.

     Aida Polanco, vice president of the FHLB funds transfer
department, testified that Wawel completed a form authorizing
Ranzinger and two others to "deal with FHLB regarding wire
transfer".  Id. at 90.  She also testified that the FHLB mailed a
daily wire activity report to Ranzinger, and the FHLB faxed wire
confirmations to Ranzinger's attention after the FHLB received
each wire transfer for the Debtor's benefit from Yale's bank.
Id. at 114, 120-121.  Nevertheless, Aida Polanco stated that she
did not know who, if anyone, at Wawel actually received the wire
transfer activity report and wire confirmations after they were
faxed or mailed.  Id. at 143.  In fact, Ranzinger explained:

> If – 800 pieces of correspondence come into the bank at
> a given time, 700 could be addressed to Robert
> Ranzinger, President and CEO.  But very frankly, and
> operationally there [sic] a recurring nature, they
> never get to me.  I don't see these things.  Wires -
> faxes of wires don't come to me.  As I have testified
> earlier, they are handled by our clerical - clerical
> person.

Id. at 165.  He also explained that he was not aware that Wawel

received daily wire transfer summaries from the FHLB.  Id. at
214.  The Bankruptcy Court found Ranzinger's testimony to be
highly credible.  Id. at 18.  See Fox v. Fox (In re Fox), 255
Fed.Appx. 631, 632 (3d Cir. 2007) (citing Bankruptcy Rule 8013
and stating that "due regard shall be given to the opportunity of
the Bankruptcy Court, to judge the credibility of the
witnesses").  Thus, Ranzinger's testimony supports the Bankruptcy
Court's determination that Wawel did not know the Debtor entered
into the Factoring Agreement with Yale until late 2005.

     The Bankruptcy Court, in contrast, regarded Oliver's
testimony as having "little evidentiary value" because "he would
say or do anything to support his business."  See Bankr. Adv.
Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 19.  See In
re Fox, 255 Fed.Appx. at 632.  In fact, each time the Debtor
transferred one of its accounts receivable to Yale pursuant to
the Factoring Agreement, Oliver would execute an assignment of
that receivable on behalf of the Debtor, which stated, inter
alia, that the Debtor was the sole owner of the receivable "free
and clear of all liens, claims, security interests, and
incumbrances [sic]".  Bankr. Adv. Proc. No. 06-2003, dkt. entry
no. 42, 7-13-07 Trial Tr., at 18-19.[2]  Thus, Oliver did not

---

     [2] Perkal testified that Oliver also completed the initial
factoring application with Yale on behalf of the Debtor.  Id. at
123.  He stated that Oliver listed Wawel as the Debtor's bank
reference, but did not disclose Wawel's Loan to the Debtor.  Id.
According to Perkal, he did not learn about Wawel's Loan to the

disclose Wawel's lien on any of the account receivable
assignments even though such omission made the above
representation in the account receivable assignments untrue.  <u>See</u>
<u>id.</u> (Oliver stating that he "never paid much attention" to the
content of the account receivable assignments Yale asked him to
complete on behalf of the Debtor).  Nevertheless, Oliver's
testimony, even if given little evidentiary weight, does support
the Bankruptcy Court's determination that Wawel did not know that
the Debtor was factoring its accounts receivable until December
of 2005.  <u>See</u> Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32,
9-28-07 Op., at 19.

    Oliver testified that he did not tell Wawel about Yale
because he did not want Wawel to "cut off" the Debtor's cash
flow.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 42, 7-13-07
Trial Tr., at 33.  Oliver admitted that during his deposition he
initially mentioned that he discussed with Ranzinger that the
Debtor wanted to have the ability to receive wire transfers from
Yale, but stated that it was "probably more right" that he did
not mention Yale to Ranzinger in discussing the wire transfers
because he did not want Wawel to know about his arrangement with
Yale.  <u>Id.</u> at 38-42 (Oliver stating, <u>inter alia</u>, "if Wawel knew
that I was factoring, I don't think any bank would be happy with
that, so I did not tell them" and "if I did say Yale [to

───────────────

Debtor until March of 2006.  <u>Id.</u> at 223-224.

Ranzinger], I'm sure I didn't say Yale Factors if that makes any difference"). He later stated that the first time he disclosed to Ranzinger or anyone at Wawel that the Debtor was involved in a factoring arrangement was at a meeting in December of 2005. Id. at 71. Thus, Oliver's testimony generally corroborates Ranzinger's testimony.

Perkal, however, testified that he spoke to Ranzinger in late 2003 to ask that Ranzinger refer Yale business, and explained to Ranzinger during that conversation that his company was "factoring" the Debtor. Id. at 141-142, 144. Nevertheless, Perkal admitted that this conversation lasted only two to five minutes, and Ranzinger does not recall such a conversation. Id. at 222. Thus, this Court finds that it was not clearly erroneous for the Bankruptcy Court to determine that Yale "ha[d] not introduced sufficient oral or documentary evidence to contradict Mr. Ranzinger's testimony that he never discussed the factoring relationship with Mr. Perkal prior to the December 9, [2]005 meeting." Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 19.

The record similarly supports the Bankruptcy Court's determination that Ranzinger did not learn of the Factoring Agreement through the FHLB wire transfers. Therefore, after reviewing the adversary proceeding docket, the trial transcripts, the exhibits submitted at trial, and the parties' briefs, the

Court concludes that the findings of fact underlying the
Bankruptcy Court's determination that Wawel did not consent to
the Debtor's sale of its collateral to Yale free of Wawel's
security interest, were not clearly erroneous.  See
Fed.R.Bankr.P. 8013.[3]  Specifically, we find that the following
factual findings made by the Bankruptcy Court did not constitute
clear error: (1) Wawel did not have actual notice of the
Factoring Agreement between the Debtor and Yale until December 9,
2005, at which time it stated that the factoring relationship was
not acceptable; (2) Wawel did not learn of the Factoring
Agreement between the Debtor and Yale by virtue of the FHLB wire
transfers; and (3) Ranzinger did not receive the daily wire
transfer activity reports or wire confirmations from the FHLB in
his capacity as president of Wawel, but instead the information
pertaining to such transfers was handled by lower-level Wawel
employees who ensured that the transfers were credited to the
proper customer account.  See In re Rashid, 210 F.3d at 205
(noting that district courts review bankruptcy court's factual

_____

    [3]  In the numerous cases cited by Yale in its brief on
appeal, the courts determined that the creditor had actual or
constructive knowledge of the sale of its collateral and
expressly or impliedly consented to the sale free of its security
interest.  However, the Bankruptcy Court here determined that
Wawel had no knowledge of the Factoring Agreement until December
of 2005, at which time it expressly stated that such agreement
was not acceptable.  The Court finds that this factual
determination was not clearly erroneous, and thus, it follows
that Wawel did not expressly or impliedly consent to the sale of
its collateral under the circumstances here.

findings for clear error).  <u>See</u> Bankr. Adv. Proc. No. 06-2003,
dkt. entry no. 32, 9-28-07 Op., at 19-20.[4]  Accordingly, we
affirm the Bankruptcy Court's conclusion that Wawel did not
authorize the sale of the Debtor's accounts receivable to Yale
free of its security interest.

**B.    Whether Yale Is a Holder in Due Course or Bona Fide
        Purchaser**

Yale argues that it demonstrated at trial that it is a
holder in due course of the accounts receivable the Debtor sold
to it, and thus, it has priority over any earlier perfected
security interest under N.J.S.A. § 12A:9-331. (Yale Br., at 38-
39.)  Yale states that a factoring company is a holder in due
course if it gives value for the collateral it receives and acts
in "good faith".  (<u>Id.</u> at 40.)  Yale notes that the Bankruptcy
Court recognized that Yale gave value for the accounts receivable
it purchased.  (<u>Id.</u>)  Yale also notes that the Bankruptcy Court
stated that although Yale acted with "honesty in fact", it did
not comply with commercially reasonable standards when it
improperly performed its UCC lien searches.  (<u>Id.</u>)  Yale argues
that (1) Wawel produced no evidence at trial suggesting that
Yale's lien search was inadequate, (2) there was no factual or

---

[4] The Bankruptcy Court did not specifically address estoppel
or waiver but the Court finds that because we have determined
that Wawel was not aware of the Factoring Agreement until
December of 2005, Wawel neither was estopped from asserting its
first priority lien, nor waived its right to assert its lien.

legal basis for the Bankruptcy Court's conclusion that it should
have been a "red flag" to Yale that a company seeking accounts
receivable financing had no "secured bank debt", and (3) the
Bankruptcy Court's determination that Yale's UCC lien search was
improper because it omitted "Inc." from the Debtor's name
"fail[s] to credit existing law . . . and fail[s] to carry its
own analysis through to its logical and inevitable conclusion."
(Id. at 41.)

Yale asserts that it satisfied the commercial reasonableness
component of "good faith" because even if it had uncovered
Wawel's UCC-1 financing statements, such financing statements and
related documents do not contain any restrictions on the Debtor's
ability to sell its collateral.  (Id. at 42-44.)  Yale further
asserts that it followed commercially reasonable standards by,
inter alia, hiring a lien search company to perform initial,
broad searches that disclosed a number of liens, and performing
subsequent monthly lien searches.  (Id. at 43.)  Yale contends
that "[t]he fact that the search failed to disclose one lien -
Wawel's - while it turned up others filed against the same entity
is not proof that its search was commercially unreasonable, only
that no system is perfect."  (Id. at 50.)  Yale also contends
that Wawel placed no restrictions on the Debtor's collection or
settlement of its accounts receivable, and thus, "Yale could not,
regardless of the efficacy of its search or the depth of its

25

inquiry, have leaned of any restriction on [the Debtor's] authority to factor." (Id.)  Accordingly, Yale argues that because it was clear from the trial evidence and applicable law that it acted with honesty in fact and in accordance with commercially reasonable standards, the Bankruptcy Court should have concluded that it was a holder in due course under the UCC. (Id. at 52.)

Wawel, in contrast, argues that Yale is not a holder in due course. (Wawel Br., at 26.)  Wawel asserts that "Yale sidesteps the issue of the negligent manner in which it conducted the search (under the wrong name) - and, in fact, appears not to have conducted the UCC search at all." (Id. (noting that, at trial, Yale was unable to produce evidence that it conducted searches prior to the closing of the Factoring Agreement).)  Wawel contends that Yale entered into the factoring relationship with the Debtor despite having actual knowledge of Wawel's prior lien. (Id. at 29.)  Wawel also contends that knowledge of Wawel's prior lien should be imputed to Yale because (1) it was Yale's common practice to perform UCC lien searches, (2) Perkal testified that, prior to the closing of the Factoring Agreement, he received bank statements from the Debtor that revealed payments to Wawel, and (3) Yale was unable to produce evidence at trial that it conducted UCC lien searches prior to the closing of the Factoring

26

Agreement, but was able to produce UCC lien searches from later periods of time.  (Id. at 29-30.)

Wawel similarly contends that the Bankruptcy Court correctly concluded that it is reasonable to expect an entity in the business of factoring of accounts receivable to conduct a proper UCC lien search using the Debtor's corporate name.  (Id. at 34.) Thus, Wawel asserts that:

> the [Bankruptcy] Court, in providing this analysis of credibility and indicating its complete surprise at the actions of an entity involved in the factoring of Account[s] Receivable, determined that Yale was not a holder in due course. [Yale's] failure to recognize this evaluation of both credibility and the law, is simply a convoluted attempt to take a "second bite at the apple".

(Id.)

N.J.S.A. § 12A:9-331(a) provides that chapter 9 of the UCC does not limit the rights of, among other parties, a holder in due course of a negotiable instrument.  Official comment 5 to N.J.S.A. § 12A:9-331 explains that:

> [u]nder this section, a secured party with a junior security interest in receivables (accounts, chattel paper, promissory notes, or payment intangibles) may collect and retain the proceeds of those receivables free of the claim of a senior secured party to the same receivables, if the junior secured party is a holder in due course of the proceeds.  In order to qualify as a holder in due course, the junior must satisfy the requirements of section 3-302, which include taking in "good faith".  This means the junior not only must act "honestly" but also must observe "reasonable commercial standards of fair dealing".  Although "good faith" does not impose a general duty of inquiry, e.g., a search of the records in filing offices, there may be

circumstances in which "reasonable commercial standards
of fair dealing" would require such a search.

N.J.S.A. § 12A:9-331, Official Cmt. 5.

Determining whether a junior secured party qualifies as a

holder in due course requires a fact-sensitive inquiry done on a

case-by-case basis.  Id.  The "holder" of an instrument is a

holder in due course if (1) the instrument did not bear apparent

evidence of forgery or alteration when it was issued or

negotiated, and (2) the holder took the instrument (a) for value,

(b) in good faith, (c) without notice that the instrument is

overdue, has been dishonored, is subject to an uncured default,

contains an unauthorized signature, or has been altered, (d)

without notice of any claim to the instrument, and (e) without

notice that any party has a defense or recoupment claim with

respect to the instrument as described in N.J.S.A. § 12A:3-305.

N.J.S.A. § 12A:3-302(a); see Adams v. Madison Realty & Dev.,

Inc., 853 F.2d 163, 166 (3d Cir. 1988); Breslin v. N.J.

Investors, Inc., 361 A.2d 1, 7 (N.J. 1976) (stating that a holder

in due course takes an instrument for value, in good faith, and

without notice that it is overdue, has been dishonored, or any

person has a defense against or claim to it).  "Good faith" is

defined as "honesty in fact and the observance of reasonable

commercial standards of fair dealing", and is determined, in

part, by looking subjectively at the mind of the holder of the

instrument.  N.J.S.A. §§ 12A:3-103(a)(4), 12A:9-102(43); Breslin,

28

361 A.2d at 7 (explaining that in New Jersey "good faith is determined by looking to the mind of the particular holder who is claiming to be a holder in due course, not what the state of mind of a prudent man should have been"); Dubin v. Hudson County Prob. Dep't, 630 A.2d 1207, 1210 (N.J. Super. Ct. 1993) (same).

Yale was a "holder" of the Debtor's accounts receivable pursuant to the Factoring Agreement. See Adams, 853 F.2d at 166 (explaining that a person asserting to be a holder in due course must first establish status as a "holder"). The parties do not dispute the Bankruptcy Court's decision to "accept, for purposes of this discussion, Yale's argument that the invoices requiring a recipient to make payment for services rendered on an individual Factored Account qualifies the Factored Accounts as 'instruments' subject to 'holder in due course' analysis". See Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 21. Thus, Yale constitutes the "holder" of certain "instruments".

There is no evidence suggesting that the accounts receivable or "instruments" the Debtor factored to Yale bore any evidence of forgery or alteration. See N.J.S.A. § 12A:3-302(a)(1). Further, the Court agrees with the Bankruptcy Court's conclusion that Yale took the Debtor's accounts receivable for value. See Util. Contractors Fin. Serv., Inc. v. Amsouth Bank, N.A. (In re Joe Morgan, Inc.), 985 F.2d 1554, 1559 (11th Cir. 1993) (stating that a holder takes an instrument for value "when he takes the

instrument in payment of any antecedent claim of any person"). See Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 23 (stating that it is undisputed that Yale paid certain monies to the Debtor before taking each account receivable); id., dkt. entry no. 42, 7-13-07 Trial Tr., at 133-134 (Perkal testifying that under the Factoring Agreement (1) the initial advance rate for the Debtor's accounts receivable was 70% less Yale's fees, and (2) the Debtor was entitled to an industry rebate of 30% if the account was timely paid).  The Court also agrees with the Bankruptcy Court's conclusion that Yale did not act in "good faith" in entering into the Factoring Agreement and accepting the Debtor's accounts receivable.  See Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 23-25.

Good faith, as explained above, requires that the holder satisfy both the subjective test of "honesty in fact" and the objective test of "observance of reasonable commercial standards of fair dealing".  N.J.S.A. §§ 12A:3-103(a)(4), 12A:9-102(43); Triffin v. Pomerantz Staffing Serv., LLC, 851 A.2d 100, 104 (N.J. App. Div. 2004) (explaining that a holder in due course must satisfy both a subjective and objective test of good faith, which requires consideration of the holder's honesty in fact and observance of reasonable commercial standards); see Breslin, 361 A.2d at 7 (explaining that in New Jersey "good faith is determined by looking to the mind of the particular holder who is

30

claiming to be a holder in due course, not what the state of mind of a prudent man should have been"). The Bankruptcy Court noted that "the evidence before the [c]ourt [did] not suggest that Yale's actions were dishonest", and thus, the court assumed that Yale had satisfied the "honesty in fact" component of good faith. See Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 23 n.6. Nevertheless, the Bankruptcy Court concluded that Yale failed to observe commercially reasonable standards when it conducted its UCC lien searches on the incomplete name of the Debtor. Id. at 25.

Perkal testified that upon receiving the Debtor's application to enter into the factoring relationship, Yale, inter alia, (1) asked Dun & Bradstreet to perform a lien search on "Jersey Tractor Trailer Training", and (2) learned that the lien search revealed "several liens that had been applied and released against Jersey Tractor Trailer Training", as well as a released lien against "Jersey Tractor Trailer Training, Inc." and liens against other entities related to Oliver. Id., dkt. entry no. 42, 7-13-07 Trial Tr., at 125-126. Perkal also testified that Yale had Dun & Bradstreet conduct lien searches each month on Yale's factoring clients, including a search of "Jersey Tractor Trailer Training". Id. at 127-129. Perkal explained that Yale had the searches conducted using "Jersey Tractor Trailer Training" rather than the Debtor's correct corporate name,

"Jersey Tractor Trailer Training, Inc.", because it "was the business name that - this corporation used in conducting its business" and "[i]t is standard practice to use a common business name for this type of a search." Id. at 130. See Dubin, 630 A.2d at 1210 (finding that the plaintiff's customary practices constituted a showing of good faith). However, Perkal offered no explanation for why the Dun & Bradstreet lien searches did not reveal Wawel's financing statement covering the Debtor's assets, including its accounts receivable. Further, Yale offered no evidence, apart from Perkal's testimony, suggesting that it actually had lien searches conducted before entering into the Factoring Agreement with the Debtor. See id. at 193-195 (Perkal testifying that the lien search conducted before the closing of the Factoring Agreement was "lost in preparing materials for this . . . entire bankruptcy and litigation" and admitting that he did not have any bill for such search and did not contact Dun & Bradstreet to determine if it had a copy or other evidence of the search results). Instead, Yale could only produce the results of searches performed after the closing of the Factoring Agreement. See id. at 126-127, 176-177, 193-194.

"Good faith may be defeated only by actual knowledge or a deliberate attempt to evade knowledge." Provident Sav. Bank v. Pinnacle Mtge. Inv. Corp. (In re Pinnacle Mtge. Inv. Corp.), No. 98-0498, 1998 U.S. Dist. LEXIS 23289, at *32 (D.N.J. Dec. 9,

1998).  Generally, a party taking a negotiable instrument is under no duty to inquire about the negotiable instrument "unless the circumstances are so suspicious that they cannot be ignored." Id. at *35.  However, "a prospective lender making use of the notice filing system has a duty to conduct a reasonable search." Star Auto. Warehouse, Inc. v. Spears (In re Thriftway Auto Supply, Inc.), 156 B.R. 300, 302 (Bankr. W.D. Okla. 1993).

It is reasonable and prudent for a prospective lender to search the debtor's correct name and wide roots of a debtor's name under an electronic filing system, and the searcher must then reasonably examine the results of the proper search.  Id. (finding that when the lender "limited its search to the formal corporate name it unreasonably hindered itself with electronic blinders"); In re Summit Staffing Polk County, Inc., 305 B.R. 347, 355 (Bankr. M.D. Fla. 2003).[5]  Thus, Yale had a duty to

_____

[5] The Court in In re Summit Staffing Polk County, Inc. explained that:

> [a]lthough Revised Article 9 does not require that a searcher exercise reasonable diligence in the selection of the names to be searched or the number of searches to conduct, the revisions to Article 9 do not entirely remove the duty imposed on a searcher to be reasonably diligent.  One who searches the filings of a state must examine the results of a proper search with reasonable diligence.  A searcher is not required to conduct multiple searches; however, a searcher must reasonably examine the results of the proper search using the debtor's correct name to determine if any financing statements relating to the debtor are disclosed by that search.

305 B.R. at 355.

search both the Debtor's correct corporate name, as well as the
roots of that name, for financing statements covering the
Debtor's accounts receivable.  The Court finds that the
Bankruptcy Court did not err in concluding that if Yale had
conducted a reasonable search, such search would have disclosed
Wawel's lien.  <u>See</u> <u>In re Pinnacle Mtge. Inv. Corp.</u>, 1998 U.S.
Dist. LEXIS 23289, at *32 (stating that good faith may be
defeated by a deliberate attempt to evade knowledge).  In fact,
the Court is unable to understand why the search Yale allegedly
did perform before entering into the Factoring Agreement did not
reveal Wawel's financing statements.  Accordingly, we find that
the Bankruptcy Court did not err in concluding that Yale's
inability to produce documentation indicating that Yale performed
a lien search before entering into the Factoring Agreement
"undercuts Mr. Perkal's credibility and confirms the reckless
manner in which the factoring relationship was pursued by Yale."
<u>See</u> Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07
Op., at 25.

  The Court also agrees with the Bankruptcy Court's
determination that Yale, a participant in the financial lending
community, was required to review its lien search results and
"red flags" should have been raised when results concerning
"Jersey Tractor Trailer" revealed no significant secured debt.
<u>Id.</u>  Accordingly, we conclude that the Bankruptcy Court did not

err in finding that Yale failed to conduct a reasonable search under general commercial practice or ordinary standards. See In re Thriftway Auto Supply, Inc., 156 B.R. at 302. Therefore, we find that the Bankruptcy Court's ruling that Yale is not a holder in due course because it cannot satisfy the good faith requirement of N.J.S.A. § 12A:3-302, was not clearly erroneous. See Triffin, 851 A.2d at 104-05 (stating that a "party who fails to make an inquiry, reasonably required by the circumstances of the transaction, so as to remain ignorant of facts that might disclose a defect cannot claim to be a holder in due course", and finding that it was commercially unreasonable for a check cashing company to fail to use a heat sensitive test mentioned on checks before cashing them).[6]

---

[6] As noted above, Wawel also contends that Yale does not qualify as a holder in due course because it entered into the factoring relationship with the Debtor even though it knew about Wawel's prior lien, and thus, it took the accounts receivable with notice of a claim to such "instruments". (See Wawel Br., at 29-30.)  The Bankruptcy Court determined that because it concluded that Yale could not meet the "good faith" requirement for holder in due course status, it need not consider whether Yale was "with knowledge" that the Factoring Agreement violated Wawel's rights as a secured party.  Bankr. Adv. Proc. No. 06-2003, dkt. entry no. 32, 9-28-07 Op., at 25-26 n.7.  Thus, because we have determined that the Bankruptcy Court's findings with respect to Yale's good faith were not clearly erroneous, the Court need not consider the remaining elements of holder in due course status, namely whether Yale was without notice that the Debtor's accounts receivable were overdue, had been dishonored, were subject to an uncured default, contained an unauthorized signature, had been altered, or were subject to any claim or defense.  See N.J.S.A. § 12A:3-302(a).

Yale also argues that it qualifies as a purchaser of an instrument under N.J.S.A. § 12A:9-330(d), which provides that "a purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than possession if the purchaser gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party."  The good faith requirement of N.J.S.A. § 12A:9-330(d) is the same requirement applicable to holders in due course.  N.J.S.A. § 12A:9-102(43) (defining good faith); N.J.S.A. § 12A:9-330, Official Cmt. 7 (stating, "[t]o collect and retain checks that are proceeds (collections) of accounts free of a senior security party's claim to the same checks, a junior secured party must satisfy the good-faith requirement . . . of this subsection [which] is the same requirement to holders in due course").  Thus, because we have already determined that the Bankruptcy Court did not err in concluding that Yale failed to satisfy the "observance of reasonable commercial standards of fair dealing" component of the good faith requirement applicable to holders in due course, it follows that Yale cannot satisfy the good faith requirement of N.J.S.A. § 12A:9-330(d).  Therefore, Yale does not qualify as a purchaser with priority over Wawel.

**C.   Whether Wawel May Claim an Interest in Both the Factored Accounts Receivable and the Proceeds of Those Accounts Receivable**

Yale argues that Wawel "should not have been permitted to reach the funds collected by or still due to Yale with respect to the factored accounts receivable because" (1) Wawel's lien attached only to the funds the Debtor received when it sold its accounts receivable to Yale, and (2) allowing Wawel to recover such funds "would award it an improper double recovery." (Yale Br., at 53.)  Yale further argues that Wawel has already received the proceeds of its collateral from Yale, and Wawel's lien attached to those proceeds. (Id. at 55.)  Yale contends that if the Court permits Wawel to receive both the proceeds of the sale of the Debtor's accounts receivable and the amounts Yale, the purchaser of those accounts, subsequently collects from the account debtors, Wawel will essentially receive a double recovery at Yale's expense. (Id. at 55-56.)  Therefore, Yale asserts that Wawel is not entitled to recover the funds Yale has received or will receive from the account debtors on the accounts receivable Yale purchased from the Debtor. (Id. at 56.)

A security interest in collateral extends to the identifiable proceeds of the collateral. N.J.S.A. § 12A:9-315(a)(2).  Proceeds are defined as, inter alia, "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral". N.J.S.A. § 12A:9-102(a)(64)(A).  A

37

security interest in proceeds is perfected if the security interest in the original collateral was perfected.  N.J.S.A. § 12A:9-315(c).  Thus, a security interest generally survives disposition of the collateral, and the secured party is entitled to repossess the collateral from the transferee or, in certain instances, may commence an action alleging conversion. N.J.S.A. § 12A:9-315, Official Cmt. 2.  "The secured party may claim both any proceeds and the original collateral but, of course, may have only one satisfaction."  Id.

The Third Circuit, in Stanziale v. Finova Capital Corporation (In re Tower Air, Inc.), addressed whether a secured creditor in a chapter 7 bankruptcy case could both recover insurance proceeds for damage to its collateral and retain the repaired collateral.  397 F.3d 191, 193 (3d Cir. 2005).  The Third Circuit determined that the insurance money constituted proceeds, but stated that the creditor's claim to those proceeds might be superseded by the UCC's limitation to "one satisfaction".  Id. at 198 (discussing former section 9-306 of the UCC, which preceded section 9-315).[7]  The court noted that few cases had addressed the issue before it, but stated that several courts had addressed circumstances in which a creditor

_____

[7] In In re Tower Air, Inc., the Third Circuit was applying Arizona's codification of the UCC, particularly former section 9-306.  The relevant provisions discussed by the Third Circuit are substantially the same as those found in New Jersey's codification of the UCC, which we apply here.

claimed both collateral and the sale proceeds of the collateral.
Id. at 200.  The Third Circuit then explained the following
hypothetical:

> A creditor lends a debtor $100, secured by an engine
> initially worth $100.  The engine's value then
> depreciates to $50, and the debtor secretly sells it to
> a third party for $50.  Th[is] hypothetical relies on
> the assumption that the third-party buyer is not a bona
> fide purchaser or buyer in ordinary course, and has no
> right to retain the engine.  We also assume that the
> sale price is . . . "proceeds", and that the creditor's
> security interest is perfected. . . . [T]he debtor then
> enters Chapter 7 bankruptcy and cannot pay its
> unsecured debts[.]

Id.

The Third Circuit, using the above hypothetical, stated that
the creditor could look to both the sale proceeds and the engine
itself to satisfy its claim, unless the creditor had authorized
the disposition of the engine free of its security interest.  Id.
See N.J.S.A. § 12A:9-315(a)(1).  The Third Circuit further
stated, "it is clear that the creditor may receive both proceeds
and collateral, and is limited only to the amount of its debt,
not the value of the underlying property."  In re Tower Air,
Inc., 397 F.3d at 201 (emphasis in original).  The Third Circuit
determined that relevant case law demonstrated that the
hypothetical creditor could recover both the collateral and the
proceeds of the collateral up to the amount of the creditor's
debt.  Id. (citing cases stating that a creditor may pursue
several remedies until its debt is satisfied).  The Third Circuit

39

then concluded that the secured creditor in the case before it was in essentially the same situation as the hypothetical creditor, and thus, held that the creditor was entitled to recover both its collateral and the insurance proceeds from the collateral. Id. at 202.

Wawel, as the hypothetical creditor discussed in In re Tower Air, Inc., provided the Debtor with a loan secured by certain assets, and Wawel perfected its security interest in such assets. See id. at 200. The Debtor's factoring of its accounts receivable essentially caused it to receive less for those accounts after paying Yale's fees. See id. Additionally, this Court has found no error in the determination that Yale is not a holder in due course or a bona fide purchaser, and Yale has not offered any other arguments suggesting that it is entitled to retain the accounts receivable and the proceeds thereof free of Wawel's lien. See id. (noting that the court's hypothetical relied on the assumption that the third-party buyer of the creditor's collateral was not a bona fide purchaser or buyer in ordinary course, and had no right to retain the collateral). Accordingly, applying the Third Circuit's reasoning in In re Tower Air, Inc. to the present case, Wawel is entitled to recover both the accounts receivable the Debtor sold to Yale and the proceeds of those accounts receivable but only up to the total amount of the outstanding debt the Debtor owes to it. See id. at

201.  Therefore, the Court will affirm the Bankruptcy Court's 10-21-07 Judgment.

## CONCLUSION

The Court, for the reasons stated <u>supra</u>, concludes that Yale has failed to demonstrate that the Bankruptcy Court erred in entering the 10-21-07 Judgment.  The Court will issue an appropriate order.


                                  <u>   s/ Mary L. Cooper                   </u>
                                  **MARY L. COOPER**
                                  United States District Judge


Dated: <u>July 14, 2008</u>